## ONEALE *v.* THORNTON.

ERROR to the circuit court of the district of Columbia, sitting in Washington, in an action of *assumpsit* upon a promissory note, dated August 6th, 1800, payable in nine months thereafter, and given by Oneale to William Thornton, surviving commissioner of the city of Washington, for the purchase-money of lots No. 1. and 2. in the square. No. 107. in that city.

The defence set up by Oneale was, that there was no consideration for the note, inasmuch as the *superintendant* of the city, who (by virtue of the act of congress passed the 1st of May, 1802, entitled " An act to abolish the board of commissioners in the city of Washington, and for other purposes,") (*vol.* 6. *p.* 126.) succeeded to all the powers, duties, and rights, of the late commissioners, whose office was abolished by that act, had abandoned or rescinded the contract of sale, by having sold and conveyed the same lots to another person in fee-simple.

The bill of exceptions taken at the trial, stated, in substance, the following case.

The States of Virginia and Maryland, having, in the year 1789, offered to the United States a cession of territory ten miles square for the permanent seat of government, the United States, by the act of congress of the 16*th of July*, 1790, (*vol.* 1. *p.* 132.) entitled " An act for establishing the temporary and permanent seat of the government of the United States," accepted the same, and authorized the pre-

*The act of assembly of Maryland, which authorized the commissioners of the city of Washington to resell lots for default of payment by the first purchaser, contemplates a single resale only; and by that resale the power given by the act is executed. By selling and conveying the property to a third purchaser, the commissioners precluded themselves from setting up the second sale, and the second purchaser, by making this defence, affirmed the title of the third purchaser.*

sident to appoint certain commissioners for the purpose of carrying the act into effect. In the summer of 1791, the greater part of the proprietors of the land included within the present bounds of the city of Washington, conveyed the same to Thomas Beall, son of George, and John M. Gantt, in trust, to be laid out as a city, and that after deducting streets, avenues, and public squares for the use of the United States, the residue should be equally divided; one moiety to be reconveyed to the original proprietors, and the other to be " sold at such time or times, in such manner, and on such terms and conditions as the President of the United States, for the time being, shall direct;" the purchase-money to be paid over to the president as a grant of money, and to be applied for the purposes mentioned in the act of congress of 16th *July*, 1790. The lots so sold were to be conveyed by Beall and Gantt to the purchasers. " And because it might so happen that by the death or removal of the aid Thomas Beall and John M. Gantt, or from other causes, difficulties might occur in fully perfecting the said trust by executing all the said conveyances, if no eventual provision should be made, it was therefore agreed and covenanted between all the said parties, that the said Thomas Beall and John M. Gantt, or either of them, or the heirs of either of them, lawfully might, and that they, at any time, at the request of the President of the United States, for the time being, would convey all or any of the said lands which should not then have been conveyed in execution of the trusts aforesaid, to such person or persons as he should appoint, subject to the trusts then remaining to be executed, and to the end that the same may be perfected—"*

* In consequence of this clause in the original deeds of trust, and by order of the president, the trustees, Beall and Gantt, transferred the trust to Gustavus Scott, William Thornton, and Alexander White, then commissioners of the city of Washington, and the survivors and survivor of them, and the heirs of such survivor, by deed dated the 30th of November, 1796. This fact was omitted to be stated in the bill of exceptions, but the cause was argued as if it had been so stated.

The legislature of Maryland, by an act passed at their November session, 1791, c. 45. subjected all the lands in the city belonging to absentees, minors, married women, and persons *non compos mentis*, to the same terms and conditions as are contained in the deeds of trust from the other proprietors, and vested the legal estate thereof in Beall and Gantt; and after declaring the manner in which a division of the property should be made between the original proprietors and the commissioners, it declares, that " all persons to whom allotments and assignments of lands shall be made by the commissioners, shall hold the same in their former estate, and interest, and in lieu of their former quantity, and subject in every respect, to all such limitations, conditions and encumbrances, as their former estate and interest were subject to, and as if the same had been actually reconveyed pursuant to the said deed in trust."

By the 4th section it is further enacted, that " all squares, lots, pieces and parcels of land, within the said city, which have been or shall be appropriated for the use of the United States, and also the streets, shall remain and be for the use of the United States; *and all the lots and parcels which have been or shall be sold to raise money as a donation as aforesaid, shall remain and be to the purchasers, according to the terms and conditions of their respective purchasers.*" The same section then proceeds to quiet the titles of all persons claiming by purchase from or under original proprietors, who have been in possession in their own right for five years before the passing of the act.

By the act of 1793, *c.* 58. § 1. the legislature of Maryland further provided that " the certificates granted, or to be granted by the said commissioners, or any two of them, to purchasers of lots in the said city, with acknowledgment of the payment of the whole purchase-money, and interest, if any shall have arisen thereon, and recorded, shall be sufficient to vest the legal estate in the purchasers, their heirs

and assigns, according to the import of such certificates, without any deed or formal conveyance."

By the 2d section of the same act it is enacted, that " on sales of lots in the said city by the said commissioners, or any two of them, under terms or conditions of payment being made therefor at any day or days after such contract entered into, if any sum of the purchase-money or interest shall not be paid, for the space of thirty days after the same ought to be paid, the commissioners, or any two of them, may sell the same lots at vendue, in the city of Washington, at any time after sixty days' notice of such sale in some of the public newspapers of Georgetown and Baltimore town, and retain, in their hands, sufficient of the money produced by such *new* sale, to satisfy all principal and interest due on the *first* contract, together with the expenses of advertisements and sale ; and the *original* purchaser, or his assigns, shall be entitled to receive from the said commissioners, at their treasury, on demand, the balance of the money which shall have been actually received by them, or under their order, on the said *second* sale ; and all lots so sold shall be freed and acquitted of all claim, legal and equitable, of the *first* purchaser, his heirs and assigns."

On the 29th of September, 1792, the President of the United States, by his order in writing, directed that the sale of lots in the city of Washington, to commence on the 8th of October then next, should be of such lots as the commissioners, or any two of them, should think proper. That the sale should be under their direction, and on the terms they should publish. And it was on the same day further ordered by the president, that any lot or lots in the city of Washington might, after the public sale which was to commence on the 8th of October, 1792, be sold and agreed for by the commissioners, or any two of them, at private sale, at such price, and on such terms, as they might think proper.

On the 24tn of December, 1793, after the passing

of the above recited act of the Maryland legislature of November session, 1793, *c.* 58.. Robert Morris and James Greenleaf entered into a contract with the commissioners for the purchase of six thousand lots in the city of Washington; payable in seven annual instalments. The lots to be selected by Morris and Greenleaf in the manner described in the contract. They selected, among others, the two lots sold afterwards to Oneale, and for the purchase of which by Oneale the note was given upon which the present suit was brought.

Morris and Greenleaf received conveyances for all the lots which they paid for under their contract, but having failed to pay some of the instalments, the commissioners, by virtue of the act of Maryland, 1793, *c.* 58. duly advertised for sale a large number of the lots contracted for by Morris and Greenleaf, including the lots in question. The terms of sale were, that the purchase-money should be paid in three, six and nine months, and secured by good negotiable paper endorsed to the satisfaction of the commissioners. At this sale the defendant Oneale purchased lots No. 1. and 2. in the square No. 107. *at a price considerably greater than the amount due thereon from Morris and Greenleaf*, and gave his promissory notes therefor, upon one of which the present suit was brought.

By the act of congress passed on the *1st of May*, 1802, *vol.* 6. *p.* 126. it is enacted, " That from and after the first day of June next, the offices of the commissioners appointed in virtue of an act passed on the 16th day of June, 1790, entitled, ' An act to establish the temporary and permanent seat of the government of the United States,' shall cease and determine; and the said commissioners shall deliver up to such person as the president shall appoint, in virtue of this act, all plans, draughts, books, records, accounts, deeds, grants, contracts, bonds, obligations, securities, and other evidences of debt in their possession, which relate to the city of Washington, and the affairs heretofore under their superin-

tendance or care." And it was further enacted, "That the affairs of the city of Washington, which have heretofore been under the care and superintendance of the said commissioners, shall hereafter be under the direction of a superintendant to be appointed by, and to be under the control of, the President of the United States; and the said superintendant is hereby invested with all powers, and shall hereafter perform all duties which the said commissioners are now vested with, or are required to perform, by or in virtue of any act of congress, or any act of the general assembly of Maryland, or any deed or deeds of trust from the original proprietors of the lots in the said city, or in any other manner whatsoever." And it was further enacted, "That the said superintendant *shall*, prior to the first day of November next, sell, under the directions of the President of the United States, all the lots in the said city which were sold antecedent to the sixth day of May, 1796, *and which the said commissioners are authorized by law to resell*, in consequence of a failure on the part of the purchasers, to comply with their contracts."

Under this act Thomas Munroe was appointed superintendant, and having given the notice required by the act of Maryland, 1793, c. 58. and Oneale having failed to pay his notes, the superintendant proceeded to sell again the lots No. 1. and 2. in the square No. 107. and one Andrew Ross became the purchaser *for a sum less than the amount due thereon from Morris and Greenleaf, the first purchasers.* Ross assigned his interest in the lots to James Moore, to whom the superintendant afterwards conveyed the lots in fee-simple, by a deed which recites the contract between Morris and Greenleaf, and the commissioners for the purchase of six thousand lots; the selection of lots No. 1. and 2. in square No. 107. as part thereof; the failure of *Morris and Greenleaf* to pay the purchase-money therefor; the sale by the superintendant to Ross, and the assignment by Ross to Moore; but takes no notice of the intermediate sale to Oneale. The money received

upon the sale to Ross, was by the superintendant applied to the credit of Morris and Greenleaf, the original purchasers.

The first resale of lots by the commissioners, for default of payment by purchasers, took place on the 2d of May, 1797. Another resale of other lots took place on the 28th of August, 1797. At these resales none of the lots contracted for by Morris and Greenleaf were resold, and in every instance except one, the lots produced, at such resale, as much as was due thereon from the first purchaser, with interest and expenses of sale. On the 18th of October, 1797, the first resale of Morris and Greenleaf's lots commenced, and the commissioners then laid it down as a rule, and from which they never afterwards departed during the existence of their offices, that no lot should be resold for less than the amount due thereon from the first purchaser. with interest and expenses of sale.

The commissioners, at the time of their resale to Oneale, had a right to resell the lots for the default of Morris and Greenleaf. The notes given by Oneale for the purchase-money, were endorsed by Basil Wood, but he endorsed only as security, and the only consideration for the notes and the endorsement was the sale of the lots.

Upon *second* resales of lots it was the universal practice of the commissioners to apply the money actually received therefor to the credit of the account of the first purchaser, taking no notice of the intermediate purchaser, and they always sold as for the default of the first purchaser, and all the deeds which they made to purchasers at such resales, recited the first contract only for the purchase of the lot, and the default of the first purchaser as the only cause of such resale; wholly pretermitting all intermediate purchasers.

Upon this statement of the evidence, the defendant moved the court to instruct the jury, that if they

should find, from the evidence, that the bargain between the plaintiffs and defendant for the sale of the two lots was understood and made by the parties to be upon the condition and contingency that if the promissory notes given for the purchase-money should be punctually paid, it should become an absolute sale to the defendant, but if the promissory notes should not be punctually paid, the commissioners should have the option of annulling the bargain for the sale, and of reselling the lots as for the original default of Morris and Greenleaf, the first purchasers. And if the jury should further find, from the evidence, that the superintendant, in reselling to Ross, and conveying to Moore his assignee, did so resell and convey the lots as for the original default of Morris and Greenleaf, *in disaffirmance of the bargain to sell them to the defendant,* and in pursuance and exercise of such option reserved to the commissioners; the plaintiffs are not entitled to recover the said purchase-money in this action.

Which instruction the court refused to give.

The defendant then prayed the court to instruct the jury, that upon the evidence offered as above, if believed by the jury, the plaintiffs were not entitled to recover any part of the purchase-money bidden by the defendant for the lots as above mentioned. But the court refused this instruction also; whereupon the defendant took a bill of exceptions and sued out his writ of error.

*P. B. Key* and *F. S. Key*, for the plaintiff in error.

These lots were originally sold to Morris and Greenleaf by the commissioners, who, upon the default of Morris and Greenleaf, sold them to the plaintiff in error. Upon his default, the superintendant, who succeeded to the rights, powers and duties of the commissioners, sold them to *Ross*, who assigned his right to *Moore*, to whom the superintendant conveyed them by a deed which passed the

legal estate in fee to Moore. The act of congress, directing him to sell certain lots, does not affect the present question; for it only directs him to sell such lots as the commissioners were, at the time of passing that act, authorized by law to resell. The question then is, what were the rights and the authority which the commissioners then had respecting these lots?

We contend that the *power of resale* given to the commissioners by the act of Maryland, 1793, *c.* 58. § 2. *can be used but once,* and expires in the using.

The evils intended to be remedied by that law, were these. Before that act was passed, whenever the commissioners had contracted to sell a lot, and the purchaser failed to pay the purchase-money at the time stipulated, the commissioners could not enforce the payment by a resale of the lot without obtaining a decree for that purpose from a court of chancery. This was productive of great delay and expense, which became oppressive in proportion to the great number of sales which they were authorized to make. The expense would not only exhaust the funds intended to be raised from the donation of the lands, but the delay would defeat the object of the donors, which was to provide suitable buildings for the accommodation of the general government.

As the commissioners were public officers of the government, having no personal interest in the subject of their trust, it was deemed prudent and proper to confide to them a limited portion of the chancery jurisdiction, as to the sales of the public lots. Accordingly they are authorized by that act, in case the purchase-money should not be paid in thirty days after it ought to have been paid, to sell the lots at vendue, upon sixty days' notice, and to *retain* sufficient of the money produced by such *new* sale, to satisfy all principal and interest due on the *first* contract, with the expenses of sale; and the *original* purchaser, or his assigns, was entitled to receive

ONEALE    the. *balance* of the money which should be actually
v.        received by them on the *second* sale; and such lots
THORNTON.  were to be freed of all claim, *legal* and equitable, of
          the *first* purchaser, his heirs and assigns.

This was a short and summary mode of foreclosing the equity of the first purchaser, and of collecting the purchase-money. It was, in effect, a statutory decree for those purposes. It not only does not contain an authority to continue to resell as often as default should be made, but it contains expressions inconsistent with such a construction.

Thus the commissioners are to retain only sufficient to satisfy the *first* contract, and the surplus is to be paid to the *original* purchaser only. Whatever, therefore, might have been the sum received from the sale to Ross, Oneale could derive no benefit therefrom; if he would not have been entitled to the surplus, he cannot be chargeable with the deficiency, without attributing to the legislature the most palpable injustice; an imputation which can never be consistent with the true construction of a doubtful statute. Indeed, the statute does not contemplate the possibility of a deficiency; it makes no provision for such a case, and it speaks of the balance as being certainly in favour of the first purchaser in all cases. Nor does it contemplate the necessity of a second resale. It seems to presume that the first resale would be for cash, and would certainly produce more than sufficient to satisfy the original purchase-money, with interest and charges. If any person is liable for the deficiency it must be Morris and Greenleaf, who, by the express provisions of the act are entitled to the surplus. The legislature intended only to give a summary remedy against the lots, not to impose a new personal responsibility upon any third person for the deficiency of Morris and Greenleaf.

The commissioners, then, having a right to resell but once, and having actually resold to Ross, received from him the purchase-money, and convey-

ed the legal estate to his assignee by a good deed in fee-simple, cannot deny it to be a valid resale, it is not for them to say that it is not the execution of the power granted them by the statute; they are estopped by their deed to deny their authority to make that resale. If that resale was valid, (which *they* cannot deny,) it must be because the intermediate contract for resale was void, or at least voidable at their option; it is also evidence that they had made their election under such option if they had it. Besides, the legal estate is gone to the assignee of Ross, who is a *bona fide* purchaser for a valuable consideration without notice of Oneale's equity, if he ever had any, so that it is not now in the power of the commissioners specifically to execute the contract on *their* part; and therefore they cannot claim a compliance with it on *his.*

The sale to Ross was made by the commissioners either in affirmance or disaffirmance of the sale to Oneale. If it was made in affirmance of the sale to Oneale, then it must have been sold as *his* property. The commissioners ought to account with *him* for the proceeds; *he* would be entitled to the surplus, and the commissioners would be authorized to retain in their hands sufficient of the money produced by such new sale to satisfy all principal and interest due on the *second* contract, (*i. e.* the contract to sell to Oneale.)

But the statute only authorizes the commissioners to retain in their hands sufficient to satisfy the amount due on the *first* contract, (*i. e.* the contract with Morris and Greenleaf,) and obliges them to pay over to them the balance.

And in conformity with these provisions of the statute, the commissioners always resold as for the default of the *first* purchasers, Morris and Greenleaf. They never pretended to retain more than the amount due from Morris and Greenleaf upon the first contract, and they always passed to their credit the surplus. The sale to Ross, therefore, could not have been in affirmance, but must have been in *disaffirmance* of the contract with Oneale.

Having then by their acts disavowed that contract, they cannot now set it up again, after they have sold and conveyed away to another the very subject of the contract, and received its value.

The consideration of the notes has totally failed. The legislature of Maryland might have granted to the commissioners a continuing power to resell upon each default, and each resale might have foreclosed the equity of all preceding parties : but they have not done so, and have used a language wholly inconsistent with such a provision.

*Rodney, Attorney-General,* and *Jones,* contra.

The grounds taken by the opposite counsel depend upon the construction of the act of Maryland; and even admitting them to be right in their construction, the notes are not void.

But we contend they are not right in that construction. The act of assembly authorizes a resale as often as default shall be made by any purchaser. The right to *resell,* is, *ex vi termini,* coextensive with the original power to sell. Every *resale* is a *new* sale, and within the statute. The terms, " *new* sale," " *first* contract," " *original* purchaser," " *second* sale," and " *first* purchaser," are all relative terms. Oneale is the *original* purchaser, the *first* purchaser, as to Ross; and *his* contract is, as to Ross, the *first* contract.

The expression in the second section of the act is extensive enough to comprehend all the resales. It is that " on *sales of lots* in the said city by the said commissioners, under terms or conditions of payment being made at a future day," &c. " and if the purchase-money shall not be paid," &c. " the commissioners may sell the same lots at vendue," &c.

" On sales of lots," means " on *any* sales of lots;" a *resale* is as much a sale as the *original* sale; consequently, if upon a resale, the purchase-

money should not be paid, the commissioners would have as good a right to sell again as they had for the first default. It was clearly an error in them to credit the amount of sales to the account of Morris and Greenleaf. But if the commissioners could *resell* but once, the second resale to Ross was without authority, and void. The sale to Oneale remains good, and the notes are valid. In that case nothing passed to Ross by the deed to him; for the commissioners, being mere trustees, and having no interest, could convey only what they had authority to convey. But if the legal estate has passed to the assignee of Ross, that circumstance does not invalidate the notes. It was the fault of Oneale himself, for he might have paid the purchase-money according to his contract, and obtained a title. During the period of two years he could have availed himself of the contract; he might have sold, or otherwise disposed of the lots. Before he can show the notes to be *nuda pacta*, he must show that there *never was a consideration* for them.

The act meant to give the commissioners the same right as to the sales of lots which a vendor of personal property has in England. If the purchaser does not pay for the goods on the day stipulated, the vendor may sell them again at the risk of the first vendee; and if they produce less, he may recover from him the difference; so that the sale to Ross may be valid, and yet Oneale liable for the difference between the sum paid by Ross, and the sum due from Morris and Greenleaf, upon the first contract.

*P. B. Key*, in reply, observed, that there must not only be a sufficient consideration for the notes at the time they were given, but there must be a consideration continuing up to the time of trial.

As to the idea of charging Oneale with the difference between the amount due from Morris and Greenleaf, and the amount paid by Ross, he asked,

ONEALE
v.
THORNTON.

who would pay that difference, if there had been, as there might be, according to the construction contended for on the other side, fifteen intermediate purchasers who had all failed to pay their notes? Would all the notes be valid? Or to which of them should the commissioners resort?

*February* 15.

MARSHALL, Ch. J. delivered the opinion of the court as follows:

This suit was instituted on a promissory note given by the plaintiffs in error, to the commissioners of the city of Washington, in payment for two lots originally sold to Morris and Greenleaf, and resold to the plaintiff in consequence of the failure of the original purchasers to pay the purchase-money. The defendant having also failed to pay the purchase-money, the lots were again resold by the superintendant, who succeeded to the powers of the commissioners, and were conveyed to the assignee of the third purchaser. Oneale, the defendant in the circuit court, contended that, by this subsequent sale and conveyance, a total failure of the consideration for which the note was given has been produced by the act of the creditor, and that he is consequently discharged from paying the note. This point having been decided against him, he has brought a writ of error to the judgment of the circuit court, and insists here, as in the court below,

1. That the consideration on which the note was given has totally failed, and that this failure is produced by the illegal conduct of the agent for the city.

In support of the judgment of the circuit court it is contended:

1. That the act of the legislature for the state of Maryland, under which both resales purport to have been made, authorizes a third sale on the fail-

ure of the purchaser at the second sale to discharge his note.

2. If this be otherwise, that such subsequent sale could not affect the right of Oneale, whose title would still be good.

The first point depends on the second section of the act entitled a further supplement to the act " concerning the territory of Columbia, and the city of Washington."

This act enables the commissioners to sell at public vendue any lots sold by them on credit, if the purchaser shall fail to pay the purchase-money thirty days after the same shall become due, and to " retain in their hands sufficient of the money, produced by such new sale, to satisfy all principal and interest due by the first contract, together with the expenses, &c. and the original purchaser, or his assigns, shall be entitled to receive from the said commissioners, at their treasury, on demand, the balance of the money which may have been actually received by them, or under their order, on the second sale, and all lots, so sold, shall be freed and acquitted of all claim legal and equitable, of the first purchaser, his heirs and assigns."

It has been argued, that the terms of this section allow a resale so long as the purchaser shall fail to pay the purchase-money, and that every purchaser, so failing, remains liable for his note, notwithstanding such resale.

But this court is of opinion, that a single resale only is contemplated by the legislature, and that by such resale, the power given by the act is executed.

The proposition, that a power to resell, if not restricted by the terms in which it is granted, implies a gift of all the power possessed at the original sale, will not be denied ; but the court is of opinion, that in this case, the power of reselling is restricted by

the words which confer it.   These words are such as, in their literal meaning, apply exclusively to a first and second sale.  The words, "first contract," " original purchaser," and " first purchaser," designate, as expressly and exclusively as any words our language furnishes, the first sale made of the property, and the purchaser at that sale, and no other.  It is true, that the natural import of words may be affected by the context, and that where other parts of the statute demonstrate an intent different from that which the words of a particular section of themselves would import, such manifest intent may be admitted to give to the words employed a less obvious meaning.  But, in this statute, no such intent appears.

Men use a language calculated to express the idea they mean to convey.  If the legislature had contemplated various and successive sales, so that any intermediate contract or purchaser was within the view of the lawmaker and intended to be affected by the power of resale given to the commissioners, the words employed would have been essentially different from those actually used.   We should certainly have found words in the act applicable to the case of such intermediate contract.   But we find no such terms; and the want of them might, in the event of different sales, for different prices, produce difficulties scarcely to be surmounted.   No man, intending to draw a law for the purpose of giving the commissioners a continuing power to resell as often as default in payment should be made by the purchaser, could express that intention in the language of this act.

It has been argued, by the defendants in error, that every subsequent default would produce the same necessity for reselling again that was produced by the default of the original purchaser, and that therefore the legislature, if their words will permit it, ought to be considered as having given the same remedy.

ONEALE
v.
THORNTON.

The influence readily conceded to this argument in general cases, is much impaired, if not entirely destroyed, by the particular circumstances attending this law.

A contract for 6.000 lots was concluded on the day that this act passed, immediately after its passage. In this large contract was merged a former contract for 3,000 lots made with one of the purchasers in this second contract. It is impossible to reflect on this fact without being persuaded that the law was agreed upon by the parties to this contract, and was specially adapted to it. The immensity of property disposed of by this sale, furnished motives for legislative aid by giving a speedy remedy to the commissioners which might not exist on the resale of particular lots occasioned by any partial default in the purchasers. In consideration of the magnitude of the contract, the lots would, according to the ordinary course of human affairs, rate lower than in cases of a few sold to individuals. Consequently it could never enter the mind of the commissioners, or of the legislature, that one of these lots resold would not command a much higher price than the estimate made of it in the original contract. We therefore find no provision made, in the law, for the event of a lot's selling for a less sum, when resold, than was originally given for it. This furnishes additional inducements to the opinion that the legislature considered itself as having done as much as the state of the city required, by giving this summary remedy for the default of the first purchaser, and leaving the parties afterwards to the ordinary course of law.

It is, then, the opinion of the court that the act of assembly, under which the superintendant has acted, did not authorize the resale to Ross of the lots which had been previously resold to Oneale.

It remains, then, to inquire whether this sale and conveyance so affects the title of Oneale, as to produce a failure of the consideration on which the note was given.

ONEALE
v.
THORNTON.

In this case, the impropriety, which has occurred in consequence of an agent's misconstruing his powers, is a fact dehors the title papers :. It is not apparent on the face of the conveyances. They purport to pass a title which is entirely unexceptionable. How far such a conveyance may be valid in law, or how far it may be affected in equity by actual or implied notice to such subsequent purchaser, this court will not now decide.

The city, by reselling the property, and conveying it to the purchaser, (an act to be justified by no state of things but the nullity of the previous sale,) has not left itself at liberty to maintain the continuing obligation of that sale ; and the plaintiff, by setting up this defence, has affirmed the title of the last purchaser.

This court is of opinion that the city has disabled itself from complying with its contract, and that, on the testimony in the cause, the plaintiff below ought not to have recovered.

Judgment reversed.

This cause came on to be heard on the transcript of the record from the circuit court, for the county of Washington, and was argued by counsel ; all which being seen and considered, this court is of opinion that the circuit court erred in refusing to give the opinion prayed by the counsel for the defendants in that court, that, on the whole testimony, if believed, the plaintiffs in that court could not support their action. This court doth therefore reverse, and annul the judgment, rendered in this cause by the said circuit court, and doth remand the cause to that court for a new trial thereof.