1812.

*Philadelphia,
Monday,
December 28.*

STODDART *against* SMITH.

THIS was an action of *debt*, brought in the name of *Benjamin Stoddart* for the use of the Bank of *Columbia*, against *Elizabeth Smith* executrix of *John Smith*, upon a bond dated the 1st of *August* 1804, conditioned for the payment of 5036 dollars 3 cents with lawful interest in one year from the date.

The cause was tried under the plea of *payment*, before *Brackenridge* J. at a *Nisi Prius* in *November*, when a verdict was found for the defendant. It came now before this court upon a motion for a new trial.

His Honour reported the case to be as follows:

The bond in question, together with other bonds and notes, amounting in all to 14,164 dollars, was given as the consideration for the purchase of 45 lots in different parts of of the city of *Washington*, which upon payment, the plaintiff contracted to convey to the defendant's testator, with general warranty. Among these were lots No. 17 and 18 in square No. 846, and lots No. 1, 15, and 16, in square No. 734, five lots that were valued by the parties in a schedule from which the purchase money was calculated, at 1910 dollars 95 cents. The whole number of lots was bought by Mr. *Stoddart* from the commissioners of the city of *Washington;* and were part of 6000 lots sold by the said commissioners to *Morris and Greenleaf* on the 24th of *December* 1793, and upon nonpayment of the purchase money, were resold by them agreeably to an act of the Legislature of *Maryland*, hereafter mentioned. It was very clearly in evidence, that the contract with *Morris and Greenleaf* was

A contract for the purchase of forty-five lots in different parts of a city, is not dissolved by failure of title to a part of them; the vendee can claim only a deduction from the price. But where a part is so essential, that the loss of it renders the rest of little value, as of a mine or valuable fishery appurtenant to very poor land, or the right of water necessary for turning a mill, the failure of title to such a part, dissolves the contract for the whole.

The courts of one state have a right to decide upon the validity of an act of Assembly of another state, in reference to the federal constitution, wherever it is essential to the decision of a cause duly brought before them.

An act of the legislature of *Maryland*, which gave authority to the commissioners of the city of *Washington*, to make resales of all lots the purchase money of which remained unpaid for a certain time after it ought to have been paid, does not impair a contract previously made by the commissioners for the sale of those lots, but merely gives a new remedy. It is therefore not unconstitutional for such a cause.

*A* sells several lots of land for a sum of money, payable by instalments, and covenants to convey with general warranty, on payment of the whole money. He then conveys the lots to *C* and *D* with general warranty, in trust to convey them to the vendee in fee simple as soon as the purchase money and interest should be paid according to contract, and delivers them the obligations for the money. *Held* that this conveyance is no impediment to a suit in *A's* name for the recovery of the money, nor to an apportionment of the purchase money, if title to some of the lots fails.

signed in the evening of the 24th, after an express had arrived from *Annapolis*, bringing a copy of the *Maryland* act, then understood to have been passed.

The defendant, under a notice that failure of consideration would be given in evidence upon the plea of payment, objected the want of title in the plaintiff, under the following circumstances.

1. That the commissioners, having once sold the lots in question to *Morris and Greenleaf*, had no authority to resell them to the plaintiff; because the act of *Maryland* which authorised the resale, was passed subsequently to the contract on the 24th of *December* 1793, and as it impaired the validity of that contract, was unconstitutional. Evidence was given to shew that the act in question, entitled " a further supplement to the act concerning the territory of *Columbia*, and the city of *Washington*," (and which enabled the commissioners to sell at public vendue any lots sold by them on credit, if the purchaser should fail to pay the purchase money thirty days after it became due) was read in the senate of *Maryland*, the first time on the 29th of *November* 1793, and laid on the table. On the 2d of *December* 1793, it was read the *second* time, and *passed*, and sent to the delegates for concurrence. In the house of delegates, it was read the first time on the day it was brought down, and on the 24*th day of December*, read and *passed*, and sent back to the senate. On the 28th of *December* the engrossed bill was read in the senate, *assented to*, and with the paper bill thereof sent to the house of delegates, where the same was read and *assented to* on the same day. From all which it was inferred that the bill did not become a law until the 28th of *December*, that being, as the counsel alleged, the day of the *final* passage of the bill; and the depositions of several gentlemen of *Maryland* were read to shew, that it was from its *final passage* that a bill became a law, without reference to the seal, and signature of the governor, those being ministerial acts, as the governor had not a negative. But no evidence was given to shew, whether by the *final* passing, was meant the passing when it was read the second time, or when the engrossed bill was assented to.

2. That of the lots referred to, the *five* before mentioned were not sold to the plaintiff at a *first resale*, but had been bid off at a prior resale by persons, for whose default they

were re-resold to the plaintiff; and which re-resale passed no title, the commissioners, according to *O'Neale* v. *Thornton* (a), having authority to make only one resale, for the default of *Morris and Greenleaf.* The plaintiff being thus incapacitated to make a good title to the whole 45 lots, the contract, it was said, was dissolved. The superintendant of the city of *Washington,* who succeeded to the commissioners, stated however, in a deposition, that the *five* lots were merely bid off at a prior resale, by persons who never gave notes for the purchase money, nor came forward to get titles for them, nor set up a claim to them; and that such lots had always been considered by the commissioners as unsold.

3. That on the 3d of *October* 1804, the plaintiff had conveyed the premises to *John Mason,* and *John Laird,* in trust to convey to the defendant's testator on his paying the whole amount of the bonds and notes; and that on the 19th of *July* 1806, the first deed being void for want of recording, another conveyance was made to the same persons, upon the same trust, and duly recorded. This it was said disabled the plaintiff from conveying, and of consequence from recovering the consideration money from the defendant.

His Honour further reported to the Court, that his charge had been in favour of the plaintiff, and that he was not satisfied with the verdict.

*Duponceau* in support of the motion, argued, that all the points of law which had been raised, were in the plaintiff's favour, and the verdict most clearly against law and evidence.

1. The authority of the commissioners to resell under the act of *Maryland,* which was denied on the ground of unconstitutionality. To this there are several answers. In the first place, this Court will not enquire into that question. Paying the respect which is due to an independent state, we must hold the law to be constitutional until the courts of *Maryland,* or the judicial power of the *United States,* shall have said other-

(a) 6 *Cranch* 53. In the report of this case, the reader, who is curious to learn the manner in which the titles of lots in the city of *Washington* are deduced from the original proprietors of the soil to the purchasers at resales by the commissioners, will find it stated at large. The titles of Mr. *Stoddart* and of *O'Neale* were similar.

1812.

STODDART
v.
SMITH.

1812.

STODDART
v.
SMITH.

wise; and the defendant, if disposed to litigate that question, might, and ought to, have called us to the courts of the country where the lands lie. But further the law is constitutional, in reference to this particular case, and in a general sense also.——As to this case, because the contract by *Morris and Greenleaf* with the commissioners, was made with a view to the law, after it was understood to have passed, and after it had legally passed. The executive of *Maryland* has no *veto*. His office, in signing and affixing the state seal, is ministerial. When a bill has passed both houses, it becomes a law; and that takes place, not when the engrossed bill is compared with the paper, and assented to as a true copy, but when the clerks enter on the journals that the bill has passed.——This law is constitutional in a general sense, supposing it not to have passed until after the contract. It is not *ex post facto*. That phrase in the federal constitution is intended to describe such laws only as relate to crimes, pains, and penalties. *Calder* v. *Bull* (a). It does not impair the validity of contracts. The obligations of commissioners and vendees remained the same as before; of the one to convey upon payment, of the other to pay at the appointed time. It merely added another remedy. It amounted to a decree of chancery for the sale, without the delay of chancery proceedings, which would have been fatal to the great object of building a city for the accommodation of government. It no more impairs the validity of contracts, than insolvent laws, bankrupt laws, our own arbitration law, the act for the abolition of survivorship in joint-tenancy, or the laws of the *United States* giving a peculiar remedy against persons accountable for public money, and on bonds for duties. The remedy is no part of the contract. Every legislature must add, alter, or take away remedies, to suit the public convenience.——Being neither *ex post facto*, nor impairing the validity of contracts, this law does not transgress the limitation of state powers appointed by the federal constitution. The case of *O'Neale* v. *Thornton* (b) throughout admits its validity.

2. The commissioners it has been decided cannot make a re-resale. But as to the *five* lots, there was no resale, until

(a) 3 *Dall.* 386.                    (b) 6 *Cranch* 53.

.the plaintiff bought. There was a mere bid at auction, and no subsequent step. Nothing passed, by the *Maryland* statute of Frauds. Act of 1715. *ch.* 47. *Sugd.* 60. If this amounted to a resale, the commissioners and the act of *Maryland* might have been wholly defeated by a trick. But if the five lots were never in the plaintiff, the residue were, and all that the defendant could claim was a deduction from the price; and of course the jury were wrong in giving nothing. The contract was not so entire, that a failure of part defeats the whole. There was no important connection between the lots. Loss of part did not make the rest comparatively worthless. It is a clear case for apportionment. (*c*)

3. The deed of trust is not in the way. If the title to all the lots is complete, the trustees will convey the whole; and if they refuse, a Court of Chancery will compel them. If title fails as to part, they must convey the residue, on payment of the purchase money, with a proper deduction.

*Read* and *Dallas* contra, contended that the verdict was right.

1. The plaintiff had no title, because the commissioners resold under a law, which if it was passed after the contract, did not give them any valid authority. Whether that law is constitutional or not, this Court must have the power to decide. The question is not only whether constitutional in reference to the constitution of *Maryland*, but whether it is so in regard to the federal constitution. Now the Judges of this Court, are sworn to support the constitution of *Pennsylvania* and the *United States;* they are bound therefore to decide the question, wherever it is duly brought before them; and it is so here, if the act is in any manner material in the case. But supposing it to violate the constitution of *Maryland*, this Court is competent to say so. The constitution is the paramount law; the statute is a subordinate law. If it is in the power of the Court to say whether the statute has been duly enacted, in any respect, they may go the whole length. Their decision cannot offend the dignity of *Maryland*, because it binds only in the particular case. It is an

(*a*) *Vid.* 2 *Atk.* 371., 6 *Ves. jr.* 678., 1 *Ves. jr.* 221., 9 *Ves. jr.* 368., 7 *Ves. jr.* 270., 10 *Ves. jr.* 505.

unconstitutional law then, because it violates the third and fourth sections of the *Maryland* bill of rights, which give to the citizens of *Maryland*, the benefit of the common law; and of course an opportunity of being heard before their rights are divested. It is contrary to the federal constitution, because it enables one party to rescind a contract, which upon principles of universal law should bind until both rescind it. All the cases cited by the other side, except the case of bankrupt laws, are clear cases of remedy to enforce contracts. Bankrupt laws flow from a special power. In the present, a remedy is not given to enforce, but to vacate the contract. It is absurd to call it a remedy upon the contract. The legislature destroy the contract in an event, for which the parties themselves did not provide; and they destroy it, when the original purchasers had a manifest interest in the land. *Sugden* 120. 122., *Noy* 88.

That the law was passed after the contract, follows from an act of both houses, no doubt essential, on the 28th of *December*, when the engrossed bill was read and assented to; and in the statute book it is stated to be a law of that date, though not signed by the governor until the 29th.

The only construction which can make it constitutional, is to say that it is not intended to be retrospective, or to have any effect on the present contract. In *O'Neale* v. *Thornton* the law in question was not material to either party.

2. The five lots were undoubtedly resold at a prior auction. The commissioners could have enforced the contract, and so the purchaser. The former have as good authority to re-resell upon nonpayment of notes given for the purchase money, as to re-resell upon a refusal to give the notes. *Stoddart* therefore cannot make title to the whole; and the contract being entire, the whole is dissolved. That it is entire, is evident, because there is but one consideration. Upon the payment of that the whole are to be conveyed, and none before; of course until the defendant pays in full, the plaintiff is not bound to make title to any part, and there is therefore no possibility of apportioning the consideration, without violating the contract.

3. The plaintiff has conveyed to trustees in trust to convey the *whole*, on payment of the *whole* money. Equity cannot create a new trust. It cannot therefore compel the trus-

tees to convey a part on the payment of a part, which must be in the case of apportionment.

TILGHMAN C. J. This is an action of debt on a bond. The defendant pleaded payment and gave notice that she should give in evidence a failure of the consideration for which the bond was passed. It appears that the plaintiff by his agent, the late colonel *Burroughs*, sold to *John Smith* deceased, forty five lots in the city of *Washington*, for the sum of 14,164 dollars payable by instalments. Several negotiable notes were given by *Smith* for the purchase money, as well as several bonds, of which this is one. The contract was made the 1st of *August* 1804. The defendant alleges, that the plaintiff was to give *Smith* a good title for the lots which it is out of his power to do for two reasons. 1st, That he has conveyed the property to other persons. 2d, That he never had a good title.

1. As to the first objection, the fact is that on the 3d of *October* 1804, *Stoddart* conveyed the lots to *John Mason* and *John Laird*, in fee simple, with a general warranty, in trust that they should convey them to *Smith*, his heirs or assigns, in fee simple, as soon as payment should be made of the purchase money and interest according to contract. I see nothing in this which should prevent the plaintiff's recovery. This conveyance in trust was no injury to *Smith*. It was manifestly intended for his benefit, by preventing any of *Stoddart's* creditors from getting a lien on those lots by judgments which they might obtain against him. If the trustees do their duty, the land will be conveyed to the devisees of *Smith*, as soon as the purchase money is paid. And if, (which ought not to be supposed), the trustees should not be disposed to do their duty, a court of equity will compel them.

2. In order to judge of the force of the second objection, we must examine the title which was shewn on the trial. These lots are part of 6000 lots in the city of *Washington*, which were sold by the commissioners of that city to *Robert Morris* and *J. Greenleaf* on the 24th of *December* 1793, for a large sum of money payable by instalments. The contract between the commissioners and *Morris and Greenleaf*, or to speak more properly, the remedy of the commissioners in

case of default of payment according to the contract, was affected by an act of assembly of the state of *Maryland*, of which it is necessary to take particular notice. It passed the senate and house of delegates on the 24th of *December* 1793, and on the 28th of the same month, the engrossed bill was read and assented to in both houses, and received the signature of the governor according to the constitution of that state. It is said by the plaintiff that the act operated as a law on the 24th of *December*, as soon as it had passed both houses. On the other hand the defendant contends that it had no force as a law until the 28th of *December*, when the engrossed bill was read, and assented to. By this act the commissioners were authorised in case any sum of money should be unpaid for the space of thirty days after it ought to have been paid, to expose the lots so unpaid for, to sale by public auction in the city of *Washington*, after sixty days notice in the newspapers. This power the commissioners exercised with regard to the 45 lots in question, of which *Stoddart* became the purchaser, and produced a regular title from the commissioners. As to five of the lots, it is alleged by the defendant that they were sold to another person by the commissioners after the default of *Morris and Greenleaf*, and that person also making default, they were again exposed to sale when they were purchased by the plaintiff. But this the plaintiff denies. It has been decided by the Supreme Court of the *United States* in the case of *O'Neale* v. *Thornton*, that the commissioners having once exercised their power of resale under the act of assembly of *Maryland*, could not exercise it a second time, so that if in fact there had been a resale before the purchase of the plaintiff, his title to these five lots was not good. But I do not consider this as a matter of any importance with regard to the question of a new trial, because although the defendant was entitled to a deduction for those lots in case the jury were in her favour on that point, yet without other ground it would not justify a verdict for the defendant. It has been contended indeed, that the contract was so entire as to be incapable of division, and that a failure of title to part dissolved the contract in the whole. It strikes me very differently. There are cases where failure of title to part ought to dissolve the whole contract; because that part may be so essential, that

the loss of it would render the residue of little value. Such
would be the case of the loss of a mine, or a valuable fishery,
attached to a parcel of poor land. Such also might be the
case of a loss of a parcel of meadow or woodland, or the
right of water necessary for turning a mill. The principle is
this, that when the part lost appears to be so essential to the
residue that it cannot reasonably be supposed the purchase
would have been made without it, the contract is dissolved·
in toto. But what is the case under consideration? The loss
of five lots not adjoining or particularly connected with the
others. There was no evidence of their being any way essen-
tial to the use or full enjoyment of the residue, and as the
price at which each of the lots was estimated in the contract
between the plaintiff and *Smith*, was proved on the trial,
there could have been no difficulty in making a proper de-
duction for their loss. But the great point in the cause turn-
ed on the act of assembly of *Maryland*, which was said to be
*ex post facto* and in violation of a preceding contract, and
therefore unconstitutional and void. The plaintiff's counsel
made a previous question whether this Court had a right to
take into consideration, the validity of an act of assembly of
another state. It appears clearly to me that we have not only
the right, but are forced to do it. The contract between the
plaintiff and *Smith* being of a transitory nature, an action
may be brought any where. It has been brought here, we
are to try it, and consequently are to decide all points colla-
terally introduced, which are essential to the decision of the
main question. That question is whether or not the plaintiff
had title to the lots sold by him; his title depends on the act
of assembly; the act of assembly depends on the constitu-
tion of the *United States*, which we are sworn to support.
So that it is impossible to get at the merits of the case, with-
out deciding on the act of assembly. Nor can our decision
have the least effect on the independence of the state of
*Maryland*, or on the validity of the act of assembly within
the jurisdiction of *Maryland*. It only affects the cause before
us; and if the courts of *Maryland* should differ from us in
opinion, they will pay no regard to our judgment, except so
far as it affects *this cause*. Let us now consider the objec-
tions to this act of assembly. That of its being *ex post facto*
was not much insisted on. Those expressions in the consti-

1812.'

STODDART
*v.*
SMITH.

tution have been construed to extend to the *criminal law only.* The decision of the Supreme Court of the *United States* in *Calder and wife* v. *Bull and wife* (3 *Dall.* 386), is on the very point. But it is said that by this law the obligation of the contract is impaired. If the law took effect before the contract, the objection vanishes. I am sorry that in the commission sent to *Maryland* for the purpose of obtaining the opinion of persons learned in the constitution and laws of that state, the *interrogatories* were *not pointed to* this question. But they were only calculated to draw from the witnesses their opinion on the point whether the signature of the governor was essential to the validity of a law. Of this there could be little doubt, as the governor performs no more than a ministerial act in signing the laws and affixing the great seal of the state in presence of both houses. The journals of the legislature of *Maryland* shew their mode of proceeding, which is somewhat singular. The bill is put to its passage after the second reading; no question is taken nor any amendment offered in either house afterwards. What passes subsequently, is only matter of form; the bill is engrossed and read (or rather supposed to be read), and assented to by each house. I have never heard of any decision on this subject, but I cannot help supposing that light may be thrown on it by the testimony of persons who have not yet been examined, persons who assisted in framing the constitution of *Maryland,* and know the construction put upon it, and the practice of the legislature from the beginning. At present I am not satisfied on this point, nor am I satisfied that even if the contract preceded the law, its obligation is impaired by it. In what is its obligation impaired? The purchasers of lots in *Washington* are not compelled to pay more money than they contracted for, nor at a different time, nor is the land to be withheld from them in case they make payment according to contract. Every thing stands precisely as agreed on, but in case of default, a summary remedy is given to the commissioners. These commissioners were appointed by the president of the *United States,* with an adequate compensation for their services to be paid by the public, and totally disinterested in the sale of lots. They appeared to the legislature of *Maryland* to be no improper persons in whom to vest a power of enforcing a contract, to

which, though they were nominal parties, they were substantially indifferent. This summary proceeding was of immense importance. A city was to be built in a short time for the accommodation of the legislature of the union. Suppose a court had been erected by the state of *Maryland* with power to proceed to judgment in a short time? This certainly would have been within their acknowledged power. What they have done is not much different. For it must not be supposed that the purchasers of lots were left at the mercy of the commissioners. I presume that on an affidavit of a purchaser, that he had paid all the money then due, the Court of Chancery would have interfered, and stopped the proceedings of the commissioners till the matter could be enquired into. We have evidence of this law having been acted under for a great many years. Property to a very great amount has been transferred under it; no court has decided against its validity. On the contrary we see that in the case of *O'Neale* v. *Thornton* mentioned before, neither party entertained an idea of its being other than an operating law. I might add that there was evidence tending to shew that the contract was made by Mr. *Greenleaf* on behalf of himself and Mr. *Morris, with an eye to this law*, which would at all events preclude them from objecting to it. On a full consideration of this case, I have found no satisfactory ground for the verdict which has been given, nor does it appear to have accorded with the sentiments of the judge before whom the cause was tried. I am therefore of opinion that there should be a new trial.

YEATES J. Equity will not decree the specific execution of an agreement respecting lands, the title whereof is defective: and I fully agree that in this state, where courts of justice exercise certain equitable powers, a man will not be compelled to pay for lands which he has purchased, though even with general warranty, where it plainly appears that he cannot obtain a good right therefor. Why should a payment be enforced, which when made cannot be retained? Why should this circuity of action be permitted, when the insolvency of the seller of the lands, or other untoward circumstances, may prevent the recovering of the money back.

The chief objection which has been urged against the

1812.

STODDART
v.
SMITH.

plaintiff's recovery in this suit, is bottomed on the supposed unconstitutionality of the *Maryland* act of *November* Sessions 1793, No. 58, respecting the city of *Washington;* under which the plaintiff derives his title through a resale made by the superintendant. It is said that this law was passed on the 28th of *December* 1793, and being four days subsequent to the contract made between the commissioners of the city of *Washington* and *Robert Morris* and *James Greenleaf* for 6000 lots of ground, (whereof the 45 lots sold by the plaintiff constitute a part) impaired the obligation of that contract, and was therefore null and void by the provisions of the constitution of the *United States.*

This objection assumes as a fact that this law took effect from the 28th of *December*, which is at least highly questionable. I profess little knowledge of the received opinions in *Maryland*, respecting the constitution of that state, or when bills which have passed both houses of the legislature, are conceived to have operation as laws. It is admitted on all hands that the governor has no negative on the laws, but that his authentication of them is necessary previous to their enrolment. Were it absolutely necessary to give a decisive opinion, when the law in question took effect, I should be strongly inclined to say, that it existed as a valid law on the 24*th* of *December*. It appears by the journals of the senate and house of delegates, *in their own language*, that the bill *passed* both houses, though it was engrossed on a subsequent day. What strikes my mind with much force, is, that the act was applied for by the advice of *Thomas Johnston*, esq. one of the commissioners, a lawyer of the soundest cast, and that it was received by express from *Annapolis* and acted upon as a law by the commissioners, previous to the execution of their contract with *Morris and Greenleaf.* I adopt the words of the Chief Justice of the *United States* in *O'Neale* v. *Thornton*, 6 *Cranch* 69, that the law must have been agreed upon by the parties to this contract, and was specially adapted to it.

But admit for the purposes of this argument, that its operative force did not commence until the 28*th* of *December*, that it had a retrospective effect on the previous agreement made with *Morris and Greenleaf*, and that they had no knowledge thereof, how are the merits of the present controversy

affected thereby? In what manner does it impair the obligation of the antecedent contract? It does not diminish in the slightest degree the legal or equitable rights of *Morris and Greenleaf* in the lands they had bargained for. It left the responsibility of the commissioners as to them, in the same state as the contract placed them in. The obligation of the contract on either side was wholly unimpaired. Each stood bound to perform their stipulated engagements. What change then did the law profess to introduce? None whatever, but the simple one of *accelerating* the remedy of the commissioners engaged in a momentous public trust, on the non-performance by the vendees, of what they ought to have done. They were empowered to do summarily, what a Court of Chancery would clearly have done upon a disclosure of the facts by bill and answer. In this I cannot see any violation of the constitution. Private rights are preserved, but a remedy for a wrong is to be administered by a new tribunal. The sovereignty of a state would be a mere farce without such an inherent power, as exigences may arise. Insolvent and bankrupt laws, arbitration and limitation acts, are more liable to the exception now taken, than the present instance, and yet I do not know, that the exercising of such legislative powers has ever been questioned. It has been often said that an act of the legislature will not be pronounced to be unconstitutional by the judicial department in a *dubious* case. Where a plain instance occurs, in the necessary discharge of official duties, it is to be hoped, that judges bound by oath, will firmly act according to the honest dictates of their consciences, independently of all consideration of consequences.

It will be remembered that the provisions of the *Maryland* act are adopted and enforced by the law of the union of the 1st of *May* 1802, 6 *U. S. Laws* 126, and I have only to add that I have no difficulty whatever on this part of the plaintiff's case.

Another ground of defence has been taken upon the testimony of *Thomas Munroe*, esq., who has sworn, that five of the lots sold to the defendant's testator, are derived to the plaintiff under a re-resale by him as superintendant, the purchasers at the second sale not having complied with the

conditions thereof, and that the superintendant had no legal authority to make such third sale, according to the decision of the Court in the case of *O'Neale* v. *Thornton* already cited. It is contended that the contract between the plaintiff and defendant's testator is *entire*, and the consideration of the 45 lots of ground cannot be severed; and therefore if the title to five of the lots cannot be made good, the whole agreement is annulled. If these five lots have been resold by an agreement valid and binding by the laws of *Maryland*, the superintendant had no power to sell them again, because he had then fully executed his authority according to the case cited. But even in that case I think the consideration money might be apportioned, according to the prices stipulated to be paid by *Smith* for each distinct lot, which are particularly set out in the letter from the plaintiff to *Turner*, read in evidence on the part of the defendants. When the possession of particular parts of the land sold may fairly be deemed the inducement to the contract, (as in the case of buildings, valuable meadow or orchards standing and situate on a portion of the land), then the incapacity of the vendor to make a good title to such portion would afford a strong ground to vacate the whole agreement; but this could not apply to separate lots in the ground plat of a city sold at different rates. If a good title therefore could not be transferred to these five lots, the defendant would only be entitled to an allowance for the deficiency, and the trustees would be compelled to transfer the rest of the property, upon being paid the balance of the consideration money after a proper reduction.

In whatever light I view this verdict, I think palpable injustice would be done if it received the sanction of this Court, and therefore I concur in opinion, that a new trial should be awarded.

BRACKENRIDGE J. Might not the commissioners of the city of *Washington* have proceeded to sell, or re-sell, no money being paid, or an inconsiderable sum; and this *toties quoties* as often as default was made? And would not courts of law and equity have sanctioned such a sale? More especially in such a case as this, where a great national object was in view, the raising money by the sale of lots in order

to erect buildings for the residence and accommodation of the general government? The sale was under an understanding with all concerned, that the consideration was to be paid down, or at the expiration of the contemplated credit. Would not the nonpayment make it a *fraud*, and avoid the contract *ab initio?* Reason and common sense and public utility, and the necessity of the case would say so; and I take it the law would say the same. For the law is founded on all these, and where the public interest is concerned, it makes a stronger case. I do not consider the law of *Maryland* as doing more than sanctioning this doctrine, and thus in a summary way expressing the same sense on this subject, which courts of law and equity would have done. I do not consider the law of *Maryland* as impairing a contract, but as pointing at, or authorising if that should be necessary, a remedy for the compelling a compliance with the contract, or ascertaining the evidence whereby it might be considered void. The resale was an act which the commissioners or the trustees had a right to make; the prior sales, or rather biddings down, amounting to no sales, and the purchasers, but persons in legal contemplation fraudulent, as defeating the object of the sale, and this for the great national purpose contemplated by those who brought the lots to market. I suggested to the counsel for the plaintiff on the trial, that the rule of the *Maryland* law might be laid out of the question. But declining this hint, and knowing his comprehension of mind, I yielded to his better judgment, and who had a right to manage his cause in his own way. But it confirmed me in my first idea, when I found that the learned counsel on reflection, and on the present argument, took it up in this point of view. For it appeared to me, and now appears, that the sale was immaterial, as the law authorising an act *to be done*, may be considered as ratifying an act which has been *done*. *Fieri non debet, factum valet.* As to the sale by the commissioners in this case, being a re-resale, I did say on the trial, and I think still there was no evidence of it. But I need not enlarge on this, as it may be seen that in my way of thinking, even a sale with solemnity and clerk's entry &c., could be considered as no sale, where on the non-complying of the terms, which I consider as a precedent

1812.

STODDART
v.
SMITH.

and implied condition of the sale, a fraud in contemplation of law did exist. And in fact in most of these sales in the town of *Washington*, the purchasers on bidding down were on the speculation of an under sale to others, before the money was paid or became due, with a profit to themselves. On all these grounds, I am of opinion that the verdict be set aside and a new trial granted. But the plaintiff on a new trial having a verdict, and obtaining a judgment, it would seem to me, that there is something which he ought to do, before he can recover, or the money be paid over. *Stoddart* had given or contemplated the giving a bond, to refund in case of eviction by any claim. By his own shewing he is insolvent or embarrassed. Shall not the bank of *Columbia* do this, so far as respects the money which they are to receive? But this I leave to a motion which may be made when the case occurs. I take notice of the language of the Court of the *United States*, as confining *ex post facto* to a *criminal* case. It is an idea purely *American*, and not the worse for that, but it is incorrect. *Ex post facto* lâw, *ex jure post facto*, translated " *ex post facto* law," embraces *civil contracts* as well as *criminal* acts. The *pœna* and the action, *ex jure post facto*, or arising on an act done or a contract made before the law passed, are both embraced by this term. Our constitutions use the phrase *ex post facto* law, or law impairing contracts. They mean no more than to specify under the idea of impairing contracts, a kind of *ex post facto* law, which was embraced under the general term *ex post facto*.

New trial granted.