## Sayres *versus* Commonwealth.

1. The Constitution provides that a writ of error in capital cases is a writ of right. The Act of March 24th 1877 prescribes that writs of error and certiorari in such cases must be taken out within twenty days from sentence. *Held*, that the legislature may prescribe the mode in which the right may be exercised, provided there is no unreasonable interference with the right itself, and that the Act of 1877 is constitutional, as the effect of the act was merely to regulate the remedy and not to deny the right.

2. Where a prisoner had not exhausted his peremptory challenges, it was not error to overrule a challenge for cause of a juror, whose name and residence were both inaccurately returned, and who had a son living with him of the same name.

3. It was not error to refuse to admit evidence that the deceased had said "my husband shot me, but I don't want him punished," for the purpose of showing that she believed him insane and not accountable for his actions.

4. Where it had been shown that the prisoner had domestic troubles, extending over years, it was not error to admit evidence of a quarrel that occurred about two years before the murder, for the purpose of showing hatred and malice on the part of the prisoner.

5. Where the prisoner's evidence of insanity extended over his lifetime, it was not error in rebuttal of his plea of insanity to receive in evidence his letters which were written ten years previously.

6. The deceased refused to live with the prisoner, and he made repeated efforts to induce her to permit him to do so, one of which immediately preceded his shooting her. The bank deposite books of the deceased and the prisoner were admitted in evidence for the purpose of showing that the prisoner had exhausted his funds and was in destitute circumstances, and that he had, therefore, a motive in desiring to return to live with his wife. *Held*, that this evidence was properly admitted.

7. In the charge the court said to the jury, "As the law presumes sanity to be the normal condition of the prisoner, and insanity an abnormal condition, the burden rests on him to prove his insanity as an excuse. * * * The evidence, therefore, which is intended to establish this defence must be satisfactory to the jury, and the conclusion such as fairly results from the evidence." *Held*, not to be error.

January 9th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ.

Error to the Court of Oyer and Terminer, of *Philadelphia county:* Of January Term 1879, No. 69.

[Sayres *v.* Commonwealth.]

Indictment of Alexander B. Sayres, for the muraer of his wife. Defendant pleaded not guilty.

At the trial it appeared that Sayres and the deceased were married in November 1866. At the time of the marriage the prisoner had two sons by a former marriage. Sayres and his wife and the two sons lived together until 1875. Previous to that year, there had been some difficulty between the prisoner and his wife about money matters, and especially with reference to a house and lot which they had purchased with their joint funds. In 1875, a violent quarrel occurred between them, and the prisoner threw his wife down stairs and broke her arm. For this offence he was arrested upon the complaint of Mrs. Sayres, and was convicted and sentenced to imprisonment.

After a short imprisonment, the prisoner was liberated at the instance of Mrs. Sayres, but she always thereafter refused to live with him or permit him to enter the house where she continued to reside with the prisoner's two sons. The prisoner frequently expressed a desire to go back to the house where his wife and sons were living, saying: "if he could get in there for the winter, he thought he would be all right." He was out of employment, was in failing health, and was in debt for his board. Under these circumstances, he tried, through the intercession of friends, to induce his wife to permit him to return to his house, and only a few days before the shooting, he went to see his wife, accompanied by a friend, Mrs. Haddon, but his wife refused to admit him, and as he went away, remarked to him that she would never have anything to do with him this side of the grave. He still insisted that he would get in, and said to Mrs. Haddon that "his wife would know better than not to treat him badly if he got back again, for if she would, he would break her neck."

On Sunday, November 18th 1877, the prisoner, having a pistol, which he had purchased the July previous, during the period of the riots, on the pretext that he was a private watchman at a mill, entered the church of which his wife was a member, and at which he had been an attendant. He entered the pew immediately behind that in which his wife and two sons were sitting, and remained there until the conclusion of the services, in which he took part. As the congregation were about leaving the church, and while Mrs. Sayres, who had stepped from her pew, was speaking to a friend, he drew the pistol, fired it, and shot his wife in the back. He then dropped the pistol, and started rapidly from the church, but was arrested by some of the church members at the foot of the stairs. He made no resistance, and in reply to remarks while on the way to the station-house, complained of a pain in his head. Mrs. Sayres was taken to a hospital, and died on the 29th of November from the injury inflicted by the ball upon her spine.

The Commonwealth offered to prove by James M. Sayres, a wit-

ness sworn on the part of the Commonwealth, that on the 15th day of September 1875, the prisoner quarrelled with the deceased and threw her down stairs, breaking her arm; that he was arrested, prosecuted by her, and sentenced to imprisonment, and that she thereafter refused to live with him—to be followed by proof of previous quarrels, and difficulties, and disputes about the property, and that their relations had been of an unfriendly character—in order to show motive and malice.  The court overruled the objection to this evidence, and admitted it.

The Commonwealth also offered in evidence three deposite books of the Philadelphia Savings Fund, stated by the bookkeeper to be the books of Alexander B. Sayres and Elizabeth Sayres, for the purpose of showing that the wife had saved money and he had not, and to show his motive for wishing to live with her.  Admitted under objection.

The fact of the shooting and the circumstances connected therewith were not seriously disputed.

The defence was insanity, and upon this point there was much conflicting testimony, covering the whole period of the prisoner's life. In this connection the defence offered to prove by two nurses at the hospital to which the deceased was removed, that the latter had said, "My husband shot me, but I don't want him punished," as showing that deceased knew he was insane and not accountable for his actions.  The court sustained the Commonwealth's objection to this evidence.

In rebuttal, the Commonwealth offered in evidence five letters of the prisoner, written by him about 1866, to show by the evidence contained therein that the prisoner was of sound mind.  The counsel for defendant objected to this evidence, on the ground that it was not in rebuttal, but the court overruled the objection.

The regular panel of jurors having been exhausted, a special venire was issued, and upon its return, among the names called was Joseph Dugan, 1001 Lemon street, who testified on *voir dire* that he resided at 1008 Lemon street; that there is no 1001 in that block; that he spelled his name Dougan; that it was pronounced as if spelled Dugan; that his son lived with him, whose name was Joseph Dougan; that his son sometimes called himself Joseph Dougan, Jr.; that he signed his name in that way; that witness sometimes writes his name Joseph Dougan, Sr.  Challenged for cause by the prisoner, and challenge overruled.  It appeared the prisoner had not exhausted the peremptory challenges allowed him.

The court (Ludlow, P. J.) charged the jury at considerable length, which charge is here given almost *in extenso*, because of its learned and able discussion of the law of homicide, as well as the law upon the subject of insanity in this state:—

"If the jury, from all the evidence, believe that this prisoner then inflicted the wound, the next and most important question

[Sayres *v.* Commonwealth.]

arises, were the circumstances such as to oblige the jury to convict him of any crime? and if so, of what degree? or ought he, for any reason, to be acquitted?

" At this point I will introduce to your notice the law of homicide. At present we shall confine your attention to the law of felonious homicide. At common law but two grades of felonious homicide existed, murder and manslaughter. Murder at common law is committed when a person of sound mind, memory and discretion, kills a reasonable creature in being, in the peace of the Commonwealth, with malice aforethought, express or implied. Manslaughter may be defined to be the unlawful and felonious killing of another without malice, express or implied. Voluntary manslaughter is the unlawful killing of another, without malice, on a sudden quarrel, or in the heat of passion. You will observe at once the vital distinction between murder and manslaughter. In murder there is the presence of malice, and the intent to kill or to do great bodily harm. In manslaughter there is the absence of malice and intent to injure, and the presence of passion. In murder there is especially malice. In manslaughter there is and can be no malice. Our legislature, in 1794, created a crime not strictly speaking known at common law, for they have divided the crime of murder into two degrees—murder in the first and murder in the second degree: 'All murder perpetrated by means of poison, lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree.'

" You will observe that under our statute, to constitute murder of the first degree, the act must be a voluntary one, that is, wilful. It must be thought of beforehand, that is, premeditated; and the judgment must also concur, therefore there must be deliberation. The great distinguishing feature of murder in the first degree is the intent to kill coupled with malice. If the act of the defendant is not wilful, deliberate and premeditated, and also malicious, together with the intent to kill, the offence is not murder of the first degree.

" The presumption against the prisoner rises no higher than murder in the second degree until it is shown by the Commonwealth to be murder of the first degree. It therefore lies on the Commonwealth to satisfy the jury of those facts and circumstances which indicate a deliberate intention to kill, and that cool depravity of heart and conscious purpose, which constitute the crime of murder of the first degree.

" The law fixes no particular time in which the wilful, deliberate and premeditated intent to take life may be formed. The jury must find the actual intent, with so much time for deliberation and premeditation as to convince them that this purpose is not the imme-

[Sayres *v.* Commonwealth.]

diate offspring of rashness and impetuous temper, and that the mind may become fully conscious of its own design: Lanahan *v.* Commonwealth, 3 Norris 89. The use of a deadly weapon, such as a pistol, when voluntarily directed against a mortal part, is evidence from which the jury may rationally infer an intention to kill, when the conduct of the prisoner and the circumstances under which he fires * * * corroborate and sustain the inference: Id.

" When there is a malicious intent to do great bodily harm, the offence is murder in the second degree, as are all other kinds of malicious killing, except those specially referred to in the statute.

" Malice may be either express or implied. Express malice is, where one kills another with sedate, deliberate mind, and formed design, which design may be evinced by external circumstances, discovering an inward intention, as by lying in wait, former grudges, menaces and plans to do great bodily harm. Malice is implied by law from any deliberate and cruel act committed by one person against another.

" Voluntary manslaughter, which, you will remember, is the grade of felonious homicide in which there is no malice, but the presence of passion, is based upon a theory which recognises the frailty of human nature, but which does not tolerate the taking of human life, no matter under what circumstances of provocation the act may have been committed. A homicide thus perpetrated is neither excusable nor justifiable, but the grade of the offence is reduced to voluntary manslaughter. Should one kill another suddenly, and without any or a considerable provocation, the law implies malice, and the killing is murder; if the provocation was great, the offence would be manslaughter, and not murder. To reduce the offence to manslaughter it is necessary that ' a quarrel should take place, and blows have been interchanged between parties in some measure upon equal terms of strength and condition for fighting, and this without regard to question of who struck the first blow.'

" To justify a conviction for manslaughter, and not murder, the death must have occurred in the heat of blood, on an immediate provocation, there having been no previous malice. The theory of the Commonwealth is that this was not only murder, but that it was murder of the first degree. To sustain this position the Commonwealth refers to the testimony of, especially among others, the Rev. Dr. Stuart, and the two sons of the prisoner, to prove that the parties had lived upon bad terms; that this led to downright violence, for which the prisoner was arrested and punished; that after an arbitration and award, the prisoner and his wife did not live together; that at various times he attempted to be again introduced into the house, even up to the Friday before the 18th of November; that in July last he purchased a pistol of John Worth, after two former purchases had resulted unsatisfactorily to

[Sayres *v.* Commonwealth.]

him; and especially that to Mrs. Alice Haddon, after repeated attempts to be introduced into the house in which his wife resided, and from which introduction, she, the wife, shrunk with 'an exclamation of terror, and ran in her room and locked the door,' he declared she would know better than to treat him badly again, for if she would he would break her neck.

" It is unnecessary, after the able comment upon the evidence by the Commonwealth's attorneys, to weary you with further details of evidence, for the defence does not take its stand upon a denial of the facts, but assert, with great ability, that the prisoner is not a man of sound mind; that he is in fact insane; that being so, he is not responsible for any act which he may have committed.    To establish this proposition the defence have called fourteen or fifteen witnesses, including one physician, and they testify, subject to cross-examination, to the insanity of the prisoner.    One speaks of him as always queer, a man of peculiar habits; and another, that he was 'as crazy as a bed-bug;' and on cross-examination said, that his brain was shattered.    Others refer to his crying because his hands were stained; passed out of the door of the house without speaking, and complained of his head; asked questions and gave strange answers.    His sisters speak of his having been afraid to sit by himself; they gave you the story of the conduct of the prisoner at the window (though he did not throw himself out), and said he supposed his wife and children had poisoned him, and was nervous, could not sleep, and complained of his head; was afraid of a dog or cat.    One witness gives an account of his trip to the Centennial ground, and the nature of his conversation.    Margaret Rankin gave you a long account of his conduct at the boarding-house, and especially for the week preceding this transaction.    She speaks of his eyes being wild, his throwing meat on the floor, and preserves around the table.    She described his conduct in the bedroom, which you must remember.    This witness was subjected to a long and severe cross-examination, and the whole testimony is for your consideration.

" Other witnesses also speak of his condition as they each, from time to time, knew him, up to the time of his arrest.    The physician who was examined, Dr. Wise, gave you his opinion of the mental unsoundness of the prisoner, together with the time and circumstances surrounding the prisoner when he examined him.    This witness was also subjected to an extended and severe cross-examination, and his whole testimony is submitted to you for your consideration.

" In addition to this testimony, the defence produce a witness to prove that blood relations of the prisoner have been afflicted with mental disease ; a sister was weak-minded ; a niece subject to fits, though she had been married for seven years ; and a cousin was born an idiot.    Without going into further detail, this is the sub-

stance of the evidence for the defence, and which, it is argued, with the circumstances directly connected with the act of killing, prove satisfactorily that the defendant is not a responsible being.

" The Commonwealth, to rebut this evidence, point to the evidence of the facts attending the killing, the conduct of the prisoner at the church, and the general circumstances of the case. The district attorney further attempts to discredit the statement of one of the sisters of the prisoner, with reference to the poison, and the visit to Dr. Graham, and also the statement of Margaret Rankin in relation to the whereabouts of the deceased during the week before November 18th 1877. In addition to this, the physician of the county prison, two of the keepers there, the officers who arrested the prisoner, all testify of the interview with the prisoner, and their opinions of his mental condition.

" They all say he was sane, in their opinions. Other witnesses, associated with him in business, or who have known him for several years, including the rector of the Church of the Ascension, speak of his mental condition ; while two witnesses, Rev. Aug. Williams and Francis Spering, say that the prisoner gave a reason for his conduct; to the first he said ' that his life was miserable and unpleasant, but that was no excuse for shooting,' and to the latter he said, ' not being allowed to visit them (the boys), was the cause of his shooting her.' A will of the prisoner and also certain letters are produced, which, it is argued all go to establish the fact, that A. B. Sayres was not an insane man, and is therefore responsible to the law. It is right also to add that the defence offered evidence to show what Dr. Smith had really said at the county prison in relation to Sayres's mental condition, and their evidence is also submitted to you for your consideration.

" I have not gone into the details of this evidence on either side, nor is it necessary, for it has been the subject of most elaborate and minute comments of the counsel on both sides. The evidence as a whole, together with the cross-examination of each of the witnesses, is again submitted to you for your consideration, and with the whole evidence before you, you naturally will inquire into the principles of law applicable to a defence of this nature, and therefore it becomes my duty to instruct you upon the law of insanity.

" We have said that the defence in this case rests upon the broad ground of insanity. What particular form the disease in this case assumed has not been specified, and therefore we consider it to be our duty to charge you upon three general divisions of the subject, which will embrace :

" 1st. General insanity.

" 2d. Partial insanity, hallucination or delusion.

" 3d. Homicidal mania.

" Some years ago, in Commonwealth *v.* Freeth, 6 Am. Law Reg.

400, May 1858, s. c. Leg. Int., March 26th 1858, p. 100, I expressed my views at length upon the subject; I have at this time given very careful and protracted consideration to the subject, and have reviewed what was then said.    With advanced knowledge and additional experience, I, without hesitation, adopt, with some slight modifications, the views then expressed, as the best expression I can now give to what I believe to be the law of Pennsylvania upon the subject of insanity.

"1. General insanity.    The defence, then, in this case, is that the prisoner, at the time of the commission of this offence, was not an accountable being.    If this allegation is true, it would be monstrous to punish him, and therefore we find the law to be, that if one charged with the commission of crime is so entirely devoid of understanding as to be either an idiot or a madman, he is thereby acquitted of all guilt—he is not criminally responsible to the offended majesty of the law, but becomes at once rather an object of pity than the subject of punishment.

It is unnecessary for me to say to you, that we will be obliged to investigate a most delicate and dangerous subject; nevertheless, we will endeavor to lay down such rules and tests as will enable you to arrive at a satisfactory conclusion.    If the prisoner at the bar, at the time he committed the act, had not sufficient capacity to know whether his act was right or wrong, and whether it was contrary to law, he is not responsible; that is in fact general insanity, so far as the act in question is concerned, and it must be so great in extent and degree, as to blind him to the natural consequences of his moral duty, and he must have utterly destroyed his perceptions of right and wrong.

"The test in this instance, as you perceive, *is the power or capacity of the prisoner to distinguish between right and wrong in reference to the particular act in question:* for although a man may be sane upon every other subject, yet, if he be *mad,* to use an expressive phrase, upon this subject, and so far as the act under immediate investigation is concerned, he thereby loses that control of his mental powers which renders him a responsible being.    The test thus suggested, has been adopted by the judges of England, and by the courts of our own state, and is too well settled to be shaken.

"2. Partial insanity.    But suppose that the prisoner was able to distinguish between right and wrong, and yet was laboring under *partial insanity, hallucination* or *delusion,* which drove him to the commission of the act as a duty of overwhelming necessity, is he in such cases responsible for his act?

"If the delusion were of such a nature as to induce the prisoner to believe in the *real* existence of facts which were entirely *imaginary,* but which, if true, would have been a good defence, he would not be responsible.    We, however, desire at this stage of our remarks, to refer rather to other delusions than the class thus

spoken of, reserving for future consideration our remarks on this branch of the subject.

" That partial insanity, hallucination, or delusion, coupled with the power of discriminating between right and wrong, is an excuse for crime, was held in the charge of Chief Justice GIBSON, in Commonwealth *v.* Mosler, 4 Barr 266, where the Chief Justice says: ' It (insanity) must amount to delusion or hallucination, controlling his will and making the commission of the act a duty of overruling necessity.' And, again, he says: 'The law is, that whether insanity be general or partial, it must be so great as to have controlled the will of its subject, and to have taken from him the freedom of moral action.'

" We cannot, however, leave this branch of the subject to doubt or uncertainty, and our conclusion is, after a somewhat extended investigation of the law, that the proper rule to be adopted upon the point in the question is the following :

" If the prisoner, although he labors under partial insanity, hallucination or delusion, did understand the nature and character of his acts, had a knowledge that it was wrong and criminal, and mental power sufficient to apply that knowledge to his own case, and knew if he did the act, he would do wrong and would receive punishment; if, further, he had sufficient power of memory to recollect the relation in which he stood to others, and others stood to him, that the act in question was contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty, he would be responsible.

" A man must, therefore, labor under something more than ' a mere moral obliquity of perception,' and 'a man whose mind squints, unless impelled to crime by this very mental obliquity, is as much amenable to punishment as one whose eye squints.'

" The jury must, therefore, even though they believe the prisoner labored under a diseased and unsound state of mind, be satisfied that this diseased or unsound state of mind, existed to such a degree, that although he could distinguish between right and wrong, yet with reference to the act in question, his reason, conscience and judgment, were so entirely perverted, as to render the commission of the act in question a duty of overwhelming necessity.

" But, there is another species of delusion entirely distinct from those which we have just considered, which is recognised by the law, and which, when the jury believe that it clearly exists, will entitle the prisoner to an acquittal. I refer to that delusion by reason of which the prisoner commits the act under a fixed bona fide belief (which is a delusion), that certain facts existed which were wholly imaginary, but which, if true, would have been a good defence.

" The judges of England, in their answer to the fourth question propounded to them by the House of Lords, say—supposing that

[Sayres *v.* Commonwealth.]

one labors under partial delusion and is not in other respects insane, 'We think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if, under the influence of delusion, he supposes a man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge, he would be liable to punishment.'

" 3. Homicidal mania. Besides the kinds of insanity to which I have already referred, and which, strictly speaking, affect the mind only, we have moral or homicidal insanity, which seems to be *an irresistible inclination to kill, or to commit some other particular offence.* We are obliged, by the force of authority, to say to you, that there is such a disease known to the law as homicidal insanity; what it is, or in what it consists, no lawyer or judge has ever yet been able to explain with precision. Physicians, especially those having charge of the insane, gradually, it would seem, have come to the conclusion that all wicked men are mad, and many of the judges have so far fallen into the same error as to render it possible for any man to escape the penalty which the law affixes to crime.

" We do not intend to be understood as expressing the opinion that in some instances human beings are not afflicted with a homicidal mania, but we do intend to say that a defence consisting exclusively of this species of insanity, has frequently been made the means by which a notorious offender has escaped punishment. What, then, is that form of disease, denominated homicidal mania, which will excuse one for having committed a murder ?

" Chief Justice GIBSON calls it ' that unseen ligament pressing on the mind and drawing it to consequences which it sees but cannot avoid, and placing it under a coercion which, while its results are clearly perceived, is incapable of resistance'—' an irresistible inclination to kill.'

"If by moral insanity it be understood only a *disordered* or *perverted* state of the affections or moral powers of the mind, it cannot be too soon discarded as affording any shield from punishment for crime ; if it can be truly said that one who indulges in violent emotions, such as remorse, anger, shame, grief, and the like, is afflicted with homicidal insanity, it will be difficult, yes, impossible, to say where sanity ends, and insanity begins ; for, by way of illustration, the man who is lashed into fury by a fit of *anger,* is in one sense insane.

" As a general rule it will be found that instances are rare of cases of homicidal insanity occurring wherein the mania is not of a *general nature,* and results in a desire to kill any and every person who may chance to fall within the range of the maniac's malevolence, as it is general, so as also it is based upon *imaginary* and not

[Sayres *v.* Commonwealth.]

upon *real* wrongs ; if it is directed against a particular person (as is sometimes the case), then also the cause of the act will be imaginary. When, therefore, the jury find from the evidence, that the act had been the result not of an imaginary but *real* wrong, they will take care to examine with great caution into the circumstances of the case, so that, with the real wrong, they may or may not also discover revenge, anger, and kindred emotions of the mind, to be the real *motive* which has occasioned the homicidal act.

" Orfila has said, ' That the mind is always greatly troubled when it is agitated by anger, tormented by an unfortunate love, bewildered by jealousy, overcome by despair, haunted by terror, or corrupted by an unconquerable desire for vengeance. Then, as is commonly said, a man is no longer master of himself ; his reason is affected, his ideas are in disorder, he is *like a madman.* But in all these cases a man does not lose his knowledge of the real relations of things ; he may exaggerate his misfortune, but his misfortune is real, and if it carry him to commit a criminal act, this act is perfectly well motived.'

" The man who has a clear conception of the various relations of life, and the real relations of things, is not often afflicted with insanity of any description ; he may become angry, and in a fit of temper kill his enemy, or even his friend, but this is not, and I hope never will be, called in courts of justice insanity. Again, one who is really driven on by an uncontrollable impulse to the commission of a crime, will be able, generally, to show its ' contemporaneous existence evinced by present circumstances, or the existence of an habitual tendency developed in particular cases, and becoming in itself a second nature.' We say generally, for it is possible that by a sudden impulse one may kill another, but such a case would be an exceptional one, and is likely to be surrounded by circumstances indicating the insane character of the act, and that it is perpetrated without a motive. Such cases should be examined by the jury with the utmost caution.

" Chief Justice LEWIS has said that moral insanity ' bears a striking resemblance to vice,' and further, ' it ought never to be admitted as a defence, until it is shown that these propensities exist in such violence as to subjugate the intellect, control the will, and render it impossible for the party to do otherwise than yield.' And again, ' this state of mind is not to be presumed without evidence, nor does it usually occur without some premonitory symptoms indicating its approach.'

" We say to you, as the result of our reflections on this branch of the subject, that if the prisoner was actuated by an irresistible inclination to kill, and was utterly unable to control his will or subjugate his intellect, and was not actuated by anger, jealousy, revenge and kindred evil passions, he is entitled to an acquittal. [As the law presumes sanity to be the normal condition of the pri-

[Sayres *v.* Commonwealth.]

soner, and insanity an abnormal condition, the burden rests upon him to prove his insanity, as an excuse for an act which would otherwise be criminal. The evidence, therefore, which is intended to establish this defence, must be satisfactory to the jury, and the conclusion such as fairly results from the evidence.]

" Upon all other questions of this cause, it is the duty of the Commonwealth to establish the guilt of the prisoner by evidence beyond a doubt. This doubt should be reasonable, and it should be something which causes the jury to pause before coming to a conclusion, upon a candid and conscientious consideration of all the testimony in the case. If such a doubt exists, it is the property of the prisoner, and he is entitled to the benefit of it.

" The law permits the jury in all cases to declare the grade of the offence, in the event of a verdict against the prisoner.

[" It is right to remark, without intending to disturb your right to fix the degree of crime, that in a case in which, if the jury believe a deadly weapon has been used under circumstances of atrocity, and with wilful deliberation and premeditation, and with intent to kill, it is difficult to perceive how a verdict less than that of murder in the first degree could be rendered.]

" The grade of offence, however, is for you. If the jury believe the prisoner to have been insane, then the Act of Assembly requires the jury ' to find specially whether such person was insane at the time of the commission of the offence, and to declare whether he was acquitted by them on the ground of such insanity.' "

The jury rendered a verdict of murder in the first degeee, and the prisoner was sentenced to be hanged. He then took this writ, and assigned for error the overruling of the challenge of Dugan, the rulings of the court on the foregoing offers of evidence, and the portions of the above charge in brackets.

The prisoner was convicted on July 13th 1878. The writ of error was not taken out until November 30th 1878. There was no special allowance of it by any Supreme judge. The Commonwealth, therefore, moved to quash the writ, on the ground that it had not issued within the time prescribed by the Act of March 24th 1877, Pamph. L. 40, which directs that " no writ of error or certiorari, in capital offences, shall be issued from the Supreme Court to any Court of Oyer and Terminer and General Jail Delivery, to remove the indictments, record and proceedings to the Supreme Court for review, after twenty days from sentence, unless specially allowed by the Supreme Court or a judge thereof."

An allowance was subsequently applied for and refused. The argument on the motion to quash was submitted on the paper-books, and there was no oral argument thereon.

*John L. Kinsey, Charles F. Warwick* and *William H. Ruddiman,* for plaintiff in error.—The Act of March 24th 1877, is in conflict with art. 5, sect. 24 of the Constitution.

[Sayres v. Commonwealth.]

There are two distinct classes of cases made subject to review : one, all cases of felonious homicide, without reference to any provision for them by law; the second, such other criminal cases as may be so provided for. The absence of the right of legislative designation and provision in the one class is made only the more significant and distinctive, by its express authorization in the other, and comes fairly within the application of the principle : *expressio unius est exclusio alterius*.

Prior to the present Constitution, the removal of criminal proceedings was regulated (see Constitution of 1790, as amended in 1838, art. 5, sect. 5), in these terms : "The party accused, as well as the Commonwealth, may, under such regulations as shall be prescribed by law, remove the indictment and proceedings, or a transcript thereof, into the Supreme Court." By this all cases of review were to be under statutory regulation. But the last constitutional convention seems to have regarded the subjects of such review as distinguishable, because of their graver or less important nature, and to have made it of absolute right in the former, *in favorem vitæ*, and, in the latter, to be under legislative direction.

The prisoner was entitled to a challenge for cause, because there were two persons of the same name, living in the same house, and because the juror was marked as living at 1001, when there was no such number on the street : Quigley v. Commonwealth, 3 Norris 18.

The alleged quarrels between the prisoner and his wife had occurred more than two years before the shooting ; and it was shown that the defendant had often requested his wife, through mutual friends, to settle their differences and live amicably together ; and it also appeared the trouble as to the property had been settled satisfactorily by arbitration, and that his earnest desire was to return to her house and his children. The law is laid down in 1 Hale P. C. 451, that if two persons quarrel and are afterwards reconciled and subsequently fall out again, and one kills the other, it will not be presumed that they fought on the old grudge.

The court erred in not defining or limiting the term satisfactory, or stating its legal force and extent, and in not also charging the jury upon the point that they were not required to be satisfied of the prisoner's insanity beyond doubt, and that the measure of proof need be such simply as flows fairly from preponderance of evidence. It need not be beyond doubt : Meyers v. Commonwealth, 2 Norris 131.

*J. R. Read*, Assistant District Attorney, and *Henry S. Hagert*, District Attorney, for the Commonwealth.—At common law, the writ of error in all criminal cases was an act of grace. A special allowance, therefore, was always required in this state, until the passage of the " Schoeppe Act." The new Constitution provides that the writ shall be obtainable in all cases, but it does not pro-

hibit the legislature from regulating how the power shall be exercised. The right is not impaired by limiting the time in which the writ must be taken out.

It was contended by the Commonwealth that the bad feeling between the prisoner and his wife continued down to the time of the shooting, and was aggravated by the repeated refusals of the wife to live with him and to permit him to return to the house, and that these, coupled with the final refusal on her part a few days before the shooting, were among the motives which led to the murder.

The charge was in the very language of Chief Justice AGNEW in Meyers *v.* Commonwealth, 2 Norris 141. The court carefully avoided the error into which the court below fell in Myers *v.* Commonwealth, and in Pannell *v.* Commonwealth, 5 Norris 260, and no form of words could more aptly convey to the mind of an ordinary juror the amount of legal proof necessary to sustain the defence of insanity.

The court was satisfied of the identity of the juror, the name and occupation being correct, and the residence given with sufficient certainty to enable any one seeking for Joseph Dougan in the neighborhood of 1008 Lemon street, to find him. The juror was afterwards challenged peremptorily, and when the jury was finally complete, the defendant had not exhausted his peremptory challenges; not having exhausted his peremptory challenges, he was not prejudiced: Commonwealth *v.* Winnemore, 2 Brewst. 380.

Mr. Justice PAXSON delivered the opinion of the court, January 20th 1879.

The Act of 24th March 1877, Pamph. L. 40, entitled, "An Act to prevent delay in the review of capital cases, in the Supreme Court," provides "that no writ of error or certiorari in capital offences, shall be issued from the Supreme Court to any Court of Oyer and Terminer and General Jail Delivery, to remove the indictment, record and proceedings, to the Supreme Court for review, after twenty days from sentence, unless specially allowed by the Supreme Court or a judge thereof." The plaintiff in error was convicted of murder of the first degree in the court below, and sentenced in accordance with law on July 13th 1878. This writ of error was not taken out until November 30th 1878. There was no special allowance thereof by this court or by a judge thereof. It is but just to the learned counsel who issued the writ, to say that they were not aware at the time, of the passage of the act above cited. After their attention had been called to it, they applied to Chief Justice SHARSWOOD to allow the writ *nunc pro tunc*, with whom I united in a denial of the application upon the merits, no point having been made at that time as to the constitutionality of the Act of 1877.

It is plain that the writ was issued in direct violation of the terms

[Sayres v. Commonwealth.]

of that act. But it is alleged that the act is in conflict with art. 5, sect. 24, of the Constitution, which provides, that "in all cases of felonious homicide, the accused, after conviction and sentence, may remove the indictment, record, and all proceedings, to the Supreme Court for review ; and in such other criminal cases as may be provided for by law."

The object of the Act of 1877, is clearly expressed in its title. It was to prevent delay in the review of capital cases in this court. It became apparent soon after the present Constitution went into effect, that the section thereof above quoted, would seriously interfere with the efficient administration of the criminal law unless the exercise of this right should be regulated by legislation. The punishment of crime should not only be certain but speedy. The result was, that in practice, writs of error were usually delayed until the death-warrant had been issued. This, under the system of return-days then in force, involved an average delay of nearly or quite a year, to which an additional year might sometimes be added, in the absence of any rule advancing such causes upon our crowded lists. The evils of such a practice were pointed out by this court, in commenting upon the Act of 1870, commonly called the Schoeppe Act (Schoeppe v. Com., 15 P. F. Smith 51), in which case it was said, by AGNEW, J. : "The effect of this law seems not to have excited attention. It has changed the whole doctrine of the criminal law as to the speed and certainty of punishment, and left to the felon both the hope and a door of escape, not only from the law's delay, but by prison breach, and all the various means of avoiding retributive justice. At this moment, two cases occur to my memory of convictions of murder in Allegheny county, delayed by dilatory motions, where the prison doors opened by unknown means, and the prisoners escaped for ever. Any murderer may, under this law, though like Probst, he may have murdered a whole family, take out his writ of error without limitation of time or condition, whether in prison under sentence, or stepping upon the trap of the gallows, with cause or without it, and suspend his case until the next term of the Supreme Court. No one could condemn him if, the death-warrant not preventing, he should wait till the term of the Supreme Court be passed, and then take out his writ of error to delay the execution of his sentence for a whole year. That only security to the public, the examination of the case and allowance of the writ for cause, is repealed." The incorporation of the principle of the Schoeppe Act into the fundamental law, did not tend to lessen the evils above referred to. To remedy them in part, this court adopted a rule in 1877, making the first Monday of each month a special return-day in capital cases, and requiring such cases to be heard on the fifth Monday after the writ is taken out, provided the court be in session in any part of the state. This rule, in connection with the Act of 1877, prohibiting

7 NORRIS—20

the issuing of a writ of error or certiorari more than twenty days from judgment, would seem to provide against unreasonable delays. It remains to consider whether said act is constitutional.

A writ of error in criminal cases is not of course by the common law: 4 Black. Com. 392. It was of grace not of right. But in the third year of Queen Anne ten of the judges expressed the opinion that in all cases under treason and felony it was not merely of grace but ought to be granted; not that it was of course, but that where there was probable cause it ought not to be denied: Rex *v.* Wilkes, 4 Burr. 2550. There has been no time in this state, at least not within the last one hundred and fifty years, when a party aggrieved could not have his writ of error. The Act of 22d May 1722, § 9, 1 Sm. Laws 138, provided "that if any person or persons shall find him or themselves aggrieved with the judgment of any of the said Courts of General Quarter Sessions of the Peace and Goal Delivery, or any other courts of record within this province, it shall and may be lawful to and for the party or parties so aggrieved, to have his or their writ or writs of error; which shall be granted them of course, in manner as other writs of error are to be granted, and made returnable to the said Supreme Court of this province." The Constitution of 1790, as amended in 1838, recognises this right. Section 5, of article 5, provided that "the party accused, as well as the Commonwealth, may, under such regulations as shall be prescribed by law, remove the indictment and proceedings, or a transcript thereof, into the Supreme Court." The Act of 13th April 1791, 3 Dall. Laws 94, is a substantial re-enactment of the Act of 1722. It expressly provides, however, that no such writ of error or certiorari shall issue unless the same be specially allowed by the Supreme Court or one of the judges thereof, or with the consent of the attorney-general. The Act of 8th February 1848, Pamph. L. 26, provided that writs of error and certiorari may be issued to remove all cases from the criminal courts of Philadelphia when specially allowed by any of the judges of the Supreme Court. The 33d section of the Criminal Procedure Act of 1860, Pamph. L. 439, is almost a rescript of the Act of 1791. It will thus be seen that this state has always had a system providing for the review of criminal cases by the Supreme Court. It commenced with the common law, was continued by the Act of 1722; then by the Act of 1791, passed immediately after the adoption of the Constitution, and later by the Act of 1860. Every person convicted of crime had a right to his writ of error provided he were aggrieved. It is true the writ required a special allocatur, but "when such removal is requisite for the due administration of justice, an allowance by one of the judges of this court is grantable to the defendant of right, and *ex debito justitiœ*, and no judge of this court can refuse it:" Commonwealth *v.* McGinnis, 2 Whart. 113. It was not until the Act of 15th February 1870, Pamph. L.

15 (Schoeppe Act), that a writ of error could be sued out without cause, for the mere purpose of delay, upon the oath of the defendant.

This was the condition of the law when the recent constitutional convention assembled. That body did not change the law as it then stood, but merely incorporated the principle of the first section of the Schoeppe Act into the Constitution. For what purpose was this done? Manifestly to prevent its repeal by the legislature. The debates in the convention show this, and there could have been no other object: vol. 4, p. 232.

The Constitution then, having given a writ of error with or without cause, in a certain class of criminal cases, as a writ of right, has the legislature the power to control and regulate it? It is conceded that the right may not be denied, nor may its exercise be unreasonably obstructed or interfered with. But may not the legislature fix return-days, and provide for a speedy hearing? This court has already done so, by virtue of its inherent power to control its business, and we have no doubt our action was in entire harmony with the Constitution. If the time of returning the writ, or of the hearing upon it, may be limited by rule of court or Act of Assembly, why may not the time be limited during which the writ may issue of course, provided such limitation be reasonable? If the legislature may fix no limitation whatever upon the issuing of such writs, it is not too much to say that capital punishment cannot be hereafter enforced in Pennsylvania. A writ of error taken out when the prisoner is standing upon the trap of the gallows, suspends his execution. Upon the hearing, he may suffer a *non pros.*, and then, when a second death-warrant issues, renew his writ of error, and so on to the end of the dreary farce. The convention which framed the Constitution, and the people who ratified it, intended no such result as this when they incorporated the right to a writ of error into the fundamental law.

It is a well-settled rule, that legislation that affects the remedy merely, and does not deny the right, is not open to objection upon constitutional grounds: Stoddart *v.* Smith, 5 Binn. 355; Smith *v.* Merchand, 7 S. & R. 260; Bleakney *v.* Farmers' and Mechanics' Bank, 17 Id. 64; Turnpike Co. *v.* The Commonwealth, 2 Watts 433; Clark *v.* The Navigation Co., 10 Id. 364; Biddle *v.* Starr, 9 Barr 461; Taggart *v.* McGinn, 2 Harris 155; Keene's Appeal, 14 P. F. Smith 268; Carter *v.* Commonwealth, 1 Grant 216; Bank of Kentucky *v.* Schuylkill Bank, 1 Parsons 180. The legislature may pass laws altering, modifying or even taking away remedies for the recovery of debts, without violating the provisions of the Constitution: Evans *v.* Montgomery, 4 W. & S. 218. Even a retrospective act, which merely touches the remedy, by removing a technical impediment, is constitutional: Hinckle *v.* Riffert, 6 Barr 196. So as to limitation acts: Miller *v.* Commonwealth, 5 W. &

S. 488; Korn *v.* Browne, 14 P. F. Smith 55. Statutes authorizing the entry of judgment for want of an affidavit of defence, have been held not to impinge upon the constitutional right of trial by jury; Lawrence *v.* Borm, 5 Norris 225. In the same line of authority, what are known as stay laws, have been held to be constitutional. A state law which suspends, for a reasonable time, execution of a judgment on a prior contract, is not unconstitutional: Chadwick *v.* Moore, 8 W. & S. 49; Breitenbach *v.* Bush, 8 Wright 313; Huntzinger *v.* Brock, 3 Grant 243; Thompson *v.* Buckley, 3 W. N. C. 560. A statute punishing the carrying of concealed deadly weapons, does not infringe the 21st section of the Bill of Rights, saving the right of the citizen to bear arms in his own defence and that of the state: Wright *v.* Commonwealth, 27 P. F. Smith 470. These and many other instances that might be multiplied to an indefinite extent, show that the legislature may lawfully exercise its power for the proper regulation of even constitutional rights. The Constitution is to some extent a declaration of rights. It neither enforces itself nor the privileges which it guarantees. It is the duty of the legislature to enforce its mandates, and to see that every citizen enjoys, or has the opportunity of enjoying, the immunities which it confers. But in providing for the enjoyment of individual rights, regard must be had to the welfare of the whole body of the people. A writ of error is a legal remedy, nothing more. Without legislation to carry it into effect, the constitutional provision in question would amount to nothing. It was said in Kenyon *v.* Stewart, 8 Wright 179, that "it cannot be doubted that it is as much the right of the legislature to restrict and limit legal remedies as it is their duty to furnish them." This right is older than any of our constitutions, or even the common law.

The Constitution of the state of Wisconsin contains a provision that "writs of error shall never be prohibited by law." It was held in Smith *v.* Packard, 12 Wis. 371, that an act of that state, passed fifteen months after the date of the plaintiff's judgment, and which reduced the time within which a writ of error should issue to two years from the date of the judgment, was constitutional. In Lombard *v.* Cowham, 34 Wis. 300, it was held that an act requiring the party suing out the writ to give bond, was constitutional; that the Constitution did not intend to prevent the legislature from providing by reasonable laws for the protection of defendants in error.

The Constitution contains no provision prohibiting the legislature from regulating the manner or the time within which writs of error shall issue in cases of felonious homicide. On the contrary, it is expressly provided by art. 5, sect. 3, that the Supreme Court "shall have appellate jurisdiction by appeal, certiorari or writ of error in all cases, as is now or may hereafter be provided by law." The right to legislate is clearly implied from this language. In the case in hand, the Constitution gives the right to the writ, but it is

[Sayres v. Commonwealth.]

for the legislature to provide for issuing it. This is within the general scope of the authority of the legislature as the sovereign law-making power of the state; it existed prior to the adoption of the Constitution, and nothing short of absolute prohibition in that instrument can take it away.

The Act of 1877 is a statute of limitation so far as it fixes a limit to the time within which a writ of error may issue of course. Is the limitation as to time reasonable? Of this we entertain no doubt. By analogy with civil proceedings, it affords a defendant all the time needed to take his writ. He can as readily issue it within twenty days as within twenty months; and if for any sufficient reason the twenty days have been allowed to pass, any one of the justices of this court has the power to allow the writ. It would be his clear duty to do so if the case presented any merits.

We are of opinion that the act is constitutional. Nor is it open to criticism upon other grounds. It denies no man's right. It imposes no hardship upon any defendant. That it requires writs of error in capital cases to be taken out with reasonable promptness contravenes no rule of public policy or constitutional law.

We have no doubt this writ of error was taken out in entire good faith. The question of the constitutionality of the Act of 1877 was a question fit to be raised, and the learned counsel for the prisoner were justified in raising it. But that question having now been settled, we think it but right to say that hereafter a writ of error sued out in a capital case more than twenty days from sentence, and without a special allocatur, would be a direct violation of law and an abuse of the process of this court.

We have examined the merits of this case with care, and with a disposition, in favorem vitæ, to allow the writ nunc pro tunc, if the record presented a question of even reasonable doubt. But it does not. The case was tried with marked accuracy and care by the learned judge of the court below, and there is nothing to justify our interference.

> The writ of error is quashed; and it is ordered that the record be remitted to the court below for the purpose of execution.