371 A.2d 186

**COMMONWEALTH of Pennsylvania**

v.

**Gerald Frank ULATOSKI, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 24, 1976.

Decided Feb. 28, 1977.

Rehearing Denied April 1, 1977.

54

John J. Hudacsek, Jr., Beaver Falls, Arthur S. Herskovitz, Aliquippa, Anthony J. Lalama, Pittsburgh, for appellant.

Joseph S. Walko, Dist. Atty., Joseph M. Stanichak, Layden C. Sadecky, Asst. Dist. Attys., Beaver, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant Gerald Frank Ulatoski was tried for the murder of his wife Joyce and convicted by a jury of murder of the third degree. Post-trial motions in arrest of judgment and for a new trial were denied by the court en banc. In this appeal,[1] appellant's sole contention is that he is entitled to a new trial because the testimony of three prosecution witnesses, which was offered to show the existence of marital discord in the Ulatoski household, should not have been admitted over his objection. We hold that the trial court did not abuse its discretion in admitting the testimony and affirm the judgment of sentence.

The facts of this case are correctly set forth in the trial court opinion:

"The testimony established that on February 4, 1975, at 3:28 A.M., a police officer of the Economy Borough Police Department and some officers from surrounding areas arrived at the home of Gerald and Joyce Ulatoski after a call to the Economy Police Department that a shooting had occurred at that residence. At the time the police arrived, the defendant, Mr. Ulatoski, was standing at the door, fully dressed and with his hair neatly

---

1. We hear this case pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P. S. § 211.202(1) (Supp.1976).

combed. He directed the officer into the nursery where the body of Joyce Ulatoski was lying on the floor near the baby's crib. On the floor about two feet from the victim's head was the gun with which she had been shot. The police officer examined Mrs. Ulatoski and could find no life signs. At that time the defendant was placed under arrest and advised of his constitutional rights. At that time the defendant gave a statement to the police as to how the shooting occurred. He said that he had arrived home at 10:00 P.M. from his part time job. He said he had been fooling around with a .22 caliber pistol at the kitchen table while he and his wife were having a discussion. He said, "not a fight, but a discussion." The defendant told the police that the baby started crying and his wife went into the baby's bedroom. He told the police that he just stepped into the baby's bedroom and the gun went off. The defendant also told the officers that the gun had a fine trigger. He also said that he used the pistol for target practice and sometimes just got the gun out to play with it.

"'The defendant's testimony at trial differed from the statement which he gave to the police officers at the scene of the shooting. At trial the defendant testified that he followed his wife from the kitchen into the baby's room with the pistol in his hand. He testified that the baby was laying in the crib and his wife was leaning over doing something with the baby; that as he walked up to her she turned toward him. At that point the gun went off, and his wife fell to the floor.

.    .    .    .    .    .    .

"It was established by a State Police firearms expert that the fatal bullet came from the weapon found near the body, and that the weapon was in good working order. Two experts testified that the weapon would not fire with the safety on and that the trigger had to be pulled in order for the weapon to fire. It was also established that the gun would not discharge accidently.

"The Commonwealth also presented evidence by a qualified gunsmith who had examined the weapon and stated that the internal parts showed no signs of wear and tear and that the gun could pass for a new weapon. He further testified that he had tested the trigger pull of the weapon and that it had an average, not a light trigger pull.

"The Commonwealth called as a witness, Ralph Plankenhorn, who is a forensic chemist with the Pennsylvania State Police. Mr. Plankenhorn testified that he and Trooper Mayfield, the firearms expert, had conducted certain test firings on a piece of cloth taken from the robe that the victim had on at the time of the shooting. They conducted these test firings in order to duplicate the entrance hole in the front of the garment. In one test the muzzle of the gun was approximately one inch from the fabric while in the other test the muzzle was against the fabric. The same pistol and the ammunition with which Mrs. Ulatoski was killed were used in the tests. Plankenhorn testified that he examined the robe which had been worn by the victim and that the imprint of the muzzle of a pistol appeared on the robe and the muzzle of the weapon found at the scene fit that imprint. He testified that you could see the muzzle imprint on the robe without using a microscope. He also testified that on the basis of the analysis of the garment and his test firings of the weapon, it was his opinion that the muzzle was against the robe when the weapon was fired. It was also established that there was a tear in the back of the victim's robe and nightgown. The chemist expressed the opinion that if the body was against a solid surface, such as a wall, the bullet would stretch the skin enough so that the cloth would be torn by the bullet. He said that these tears could have been made even if the bullet had not exited the victim's skin.

"The Commonwealth presented testimony by two friends of the victim pertaining to the marital relation-

ship of the defendant and the victim. Sheila Bednarcik testified that Mrs. Ulatoski had visited her frequently during 1973 and 1974. She said that on most of the visits, Joyce arrived at three o'clock in the morning. On one specific occasion in the Fall of 1973, the victim arrived at her friend's home around three o'clock in the morning and was upset and crying. She had a black eye and bruises on her arm, throat, hip and side. The witness also testified that on another occasion, in the Spring of 1974, Mrs. Ulatoski came to her home around three o'clock in the morning, upset and crying, with a black eye and bruises all over her. She testified that on several occasions the victim had stayed with her overnight and on one occasion in late September or early October of 1973, she stayed for three or four days. On these occasions she did not bring anything with her. She also testified that in July of 1973 she visited the Ulatoski home in Economy Borough, at the invitation of Mrs. Ulatoski. She said that on that occasion the defendant talked to his wife in a nasty manner and walked out of the house and slammed the door.

"The Commonwealth also presented the testimony of Sharon Herman who was the sister of Sheila Bednarcik. She testified that she had called Mrs. Ulatoski on the telephone in the Fall of 1973 and that she recognized the defendant's voice yelling at his wife about being on the phone, after which the phone went dead. She said that in November of 1974 she called her again and heard the defendant order the victim to get off the telephone. She further testified to visiting the victim in Bellevue Hospital in 1973 and observing bruises on her neck, and arms at that time.[2] She corroborated her sister's testimony about the victim staying at their residence for three days in 1973 and about her black eye and bruises.

2. The trial court opinion omits that Ms. Herman also testified that she visited Mrs. Ulatoski in the Hospital and observed bruises on Mrs. Ulatoski's body.

"The victim's aunt [Mildred Green] also testified to having seen Mrs. Ulatoski in 1973 and 1974 with a black eye and bruises."

Appellant contended that the shooting was accidental. He presented a series of character witnesses who vouched for his reputation as a peaceful, law-abiding citizen. Other witnesses were called to rebut the Commonwealth's evidence that appellant beat his wife. Several family friends testified that they believed that appellant and Mrs. Ulatoski had a happy marital relationship; none could recall seeing Mrs. Ulatoski with a black eye or body bruises. Dr. Sabatelle, Mrs. Ulatoski's obstetrician and gynecologist, testified that she visited his office on March 9, April 9 and June 3, 1974. Dr. Sabatelle stated that he did not observe a black eye or body bruises and that Mrs. Ulatoski had no physical complaints. Finally, appellant called the medical records librarian from Bellevue Hospital who testified that according to hospital records Mrs. Ulatoski had not been hospitalized in the fall of 1973.

When appellant took the stand, he testified that he loved his wife and had no desire to harm her. He admitted that they had quarrelled in the past and that he had struck her on one occasion, causing her eye to swell. He remembered that she had a black eye in 1974, but said that it resulted from playing with the family dog. He also testified that Mrs. Ulatoski had been hospitalized in 1973 but had no bruises on her body at that time or at any time during September 1973. In short, appellant denied that he had physically abused his wife.

■■ Appellant asserts that the testimony of Ms. Bednarcik, Ms. Herman and Ms. Green should not have been admitted into evidence. On many occasions, this Court stated that evidence concerning the previous relations between a defendant and a homicide victim is relevant and admissible for the purpose of proving ill will,

motive or malice.[3]   Evidence of prior occurrences in which the accused threatened, assaulted, or quarrelled with the decedent may be admissible for this purpose.[4] This principle applies when the decedent was the spouse of the accused.[5]   Thus, evidence concerning the nature of the marital relationship is admissible for the purpose of proving ill will, motive or malice.[6]   This includes, in particular, evidence that the accused physically abused his or her spouse.[7]

3. *Commonwealth v. Nelson*, 396 Pa. 359, 152 A.2d 913 (1959); *Commonwealth v. Peyton*, 360 Pa. 441, 62 A.2d 37 (1948); *Commonwealth v. Barnak*, 357 Pa. 391, 54 A.2d 865 (1947); see *Commonwealth v. Boden*, 399 Pa. 298, 159 A.2d 894 (1960); *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A.2d 861 (1960); *Commonwealth v. Patskin*, 372 Pa. 402, 93 A.2d 704 (1953); *Commonwealth v. Delfino*, 259 Pa. 272, 102 A. 949 (1918).

4. *Commonwealth v. Glover*, 446 Pa. 492, 286 A.2d 349 (1972) (plurality opinion); *Commonwealth v. Faison*, 437 Pa. 432, 264 A.2d 394 (1970); see *Commonwealth v. Novak*, 395 Pa. 199, 150 A.2d 102 (1959); *Commonwealth v. Minoff*, 363 Pa. 287, 69 A.2d 145 (1949); *Commonwealth v. Crossmire*, 156 Pa. 304, 27 A. 40 (1893). See also *Commonwealth v. Edwards*, 318 Pa. 1, 178 A. 20 (1935).
   Professor Wigmore explains the relevance of such evidence through the following example:
   "[T]o show that A struck his wife, the fact is offered that he beat her five years before; here three steps of inference are involved: (1) the beating five years before evidences a then violent emotion towards her; (2) the violent emotion five years ago evidences a continuance of the emotion to the time in issue; (3) the violent emotion at the time in issue evidences the operation of the emotion in the act of striking as charged."
   2 J. Wigmore, Evidence § 395, at 349 (3d ed. 1940) [hereinafter cited as Wigmore].

5. "The precedents dealing with instances of hostility to a wife . . . form a numerous group by themselves, though the principle and its application are precisely the same as in the foregoing general instances." Wigmore § 397, supra at 353 (footnote omitted).

6. See *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974); *Commonwealth v. Kravitz*, supra; *Commonwealth v. Boden*, supra; *Commonwealth v. Nelson*, supra; *Commonwealth v. Peyton*, supra; *Commonwealth v. Jones*, 269 Pa. 589, 113 A. 57 (1921).

7. *Commonwealth v. Petrakovich*, supra; *Commonwealth v. Boden*, supra; *Commonwealth v. Nelson*, supra; *Commonwealth v. Patskin*, supra; *Commonwealth v. Peyton*, supra; *Commonwealth v. Barnak*, supra; *Commonwealth v. Jones*, supra; *Commonwealth*

██ The challenged testimony constituted circumstantial evidence offered to prove that appellant struck Mrs. Ulatoski on several occasions and that their marital relationship was disharmonious. Appellant's mistreatment of his wife was itself circumstantial evidence which tended to establish that the shooting in February 1975 was intentional.[8] Appellant contends that the testimony dealt with incidents which were too remote in time to be relevant.

█ This Court has stated that evidence of prior occurrences involving the accused and decedent may be admissible only if it is related to the offense for which the accused is on trial.[9] An incident which occurred at a time sufficiently remote from the homicide would not be related to the later crime. However, as Mr. Justice Pomeroy stated for the majority in *Commonwealth v. Petrakovich*, 459 Pa. 511, 524, 329 A.2d 844, 850 (1974):

> "Although evidence of [prior occurrences] which is too remote is not properly admissible . . . it is generally true that remoteness of the prior instances of hostility and strained relations affects the weight of that evidence and not its admissibility." [10]

*v. Birriolo*, 197 Pa. 371, 47 A. 355 (1900); *Sayres v. Commonwealth*, 88 Pa. 291 (1879).

8. It is permissible to establish a fact desired to be used circumstantially by circumstantial evidence. Wigmore § 41, supra.

9. *Commonwealth v. Baker*, 466 Pa. 382, 353 A.2d 406 (1976) (Opinion of Nix, J., joined by Jones, C. J.); *Commonwealth v. Faison*, supra; *Commonwealth v. Minoff*, supra; see *Commonwealth v. Barnak*, supra.

10. In *Commonwealth v. Jones*, supra, this Court stated: "The length of time intervening is a circumstance to be considered by the jury in determining whether or not there was a connection between the [prior occurrence] and the homicidal act, but it does not affect the relevancy of the testimony. 'The remoteness . . . may greatly impair . . . probative force, but as a rule does not affect . . . admissibility.'"

269 Pa. at 592, 113 A. at 58–59, quoting *Commonwealth v. Delfino*, 259 Pa. at 277, 102 A. at 951.

Testimony concerning the marital relationship between a defendant and decedent, like any other evidence, is subject to the general evidentiary rules governing competency and relevancy.[11]   Accordingly, the testimony may involve events so remote from the date of the crime that it has no probative value.   However, no rigid rule can be formulated for determining when such evidence is no longer relevant.[12]   As Professor Wigmore states: "What that limit of time should be must depend largely on the circumstances of each case, and ought always to be left to the discretion of the trial court." [13]

11.   *Commonwealth v. Glover,* supra; *Commonwealth v. Barnak,* supra.   All evidence, even when determined to be relevant, is inadmissible if the trial court, in its discretion, determines that its prejudicial impact outweighs its probative value.   See J. McCormick, Evidence § 185, at 438–40 (2d ed. 1972).   Thus, while the prosecution may introduce evidence of other criminal acts of the accused for some purpose other than showing a probability that he committed the crime on trial because of his criminal character, such evidence may still be excluded by the trial court because of its prejudicial nature.   The inquiry does not end when the trial court determines that evidence of prior crimes has independent relevance.   The trial court should exercise its discretion "to exclude the other-crimes evidence, even when it has substantial independent relevancy, if in [its] judgment its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial."   Id. at 190, at 453–54 (footnote omitted).   Here, the Commonwealth introduces evidence of prior assaults by appellant against Mrs. Ulatoski for the purpose of proving that the February 1975 shooting was intentional.   We find that the probative value of this testimony sufficiently outweighed its prejudice and conclude that the trial court did not abuse its discretion in admitting the testimony.

12.   For this reason, we reject appellant's suggestion that the Commonwealth must demonstrate that the relationship between appellant and Mrs. Ulatoski remained discordant from April 1974 up until Mrs. Ulatoski's death in February 1975.   However, proof that conflict continued from the time described in the testimony until shortly before a homicide is a factor to be considered when determining the admissibility of evidence of a prior occurrence which is arguably too remote.   See *Commonwealth v. Minoff,* supra; *Commonwealth v. Jones,* supra.

13.   Wigmore § 396, supra at 349–50 (emphasis deleted); see Wharton's Criminal Evidence § 152 (13th ed. 1972).   Cf. *Commonwealth v. Mennyweather,* 458 Pa. 12, 329 A.2d 493 (1974).

64

The trial court's determination will not be disturbed absent an abuse of discretion.

■ Here, the trial court admitted the testimony of three witnesses who observed bruises upon Mrs. Ulatoski's body as much as 17 months before her death. These observations did not involve a single, isolated incident. Rather, each witness testified that she noted signs of serious physical abuse on at least two different occasions.[14] The testimony presented by the Commonwealth described a pattern of physical abuse and indicated that appellant and Mrs. Ulatoski had a stormy marriage. Therefore, the testimony was relevant to the determination whether the shooting was accidental or intentional. On these facts, we hold that the trial court did not abuse its discretion in admitting into evidence testimony concerning events which occurred between 9 and 17 months before the shooting.[15]

■ Appellant also contends that the testimony should not have been admitted because there was no showing that the injuries to Mrs. Ulatoski were inflicted by appellant. The thrust of this argument is that absent such a showing, the evidence was irrelevant.

14. Another witness, Donald Naugle, testified that he saw Mrs. Ulatoski with a black eye over a single four day period. However, Mr. Naugle was called as a rebuttal witness for the Commonwealth and appellant does not argue, in this appeal, that the testimony was inadmissible.

15. See generally *Commonwealth v. Baker,* supra (Opinion of Nix, J., joined by Jones, C. J.) (testimony concerning a single incident 8 to 10 months before the homicide admissible only because the prosecution had produced a substantial amount of other evidence of a disharmonious relationship between defendant and decedent); *Commonwealth v. Nelson,* supra (prosecution may elicit on cross-examination that defendant had shot her husband a year before the killing, after she had testified as to her good relationship with her husband); *Commonwealth v. Peyton,* supra (testimony that witness observed defendant beat his wife 2½ years before the killing admissible); *Commonwealth v. Delfino,* supra (evidence that defendant and decedent had ceased living together after an argument 2½ years before the homicide admissible).

One could reasonably infer from the challenged testimony that Mrs. Ulatoski's injuries were inflicted by appellant. Therefore, we hold that the trial court committed no error in ruling that the evidence was relevant. We reject any suggestion that the Commonwealth is required to prove the nature of a victim's relationship with a defendant by direct, rather than circumstantial evidence.

Ms. Bednarcik testified that when Mrs. Ulatoski came to her in 1973 and 1974, she usually arrived at 3:00 a. m. On two occasions, she was bruised, crying and upset when she got to Ms. Bednarcik's home. Mrs. Ulatoski did not bring anything with her when she stayed over and one time she remained for four days. Ms. Herman corroborated Ms. Bednarcik's testimony.

The record indicates that during the entire period described in the challenged testimony, appellant and Mrs. Ulatoski were living together. Thus, as the trial court cogently stated:

> "Considering the frequency and unusual hours of the visits, the upset state of the victim and the victim's arrival for a four day visit with nothing except the clothes she was wearing, the jury was entitled to infer that the victim had acquired the black eyes and bruises as a result of problems with her husband."

Accordingly, we hold that the trial court did not err when it ruled that the testimony of these witnesses was admissible.

Judgment of sentence affirmed.

NIX, J., did not participate in the consideration or decision of this case.

MANDERINO, J., filed a dissenting opinion.

MANDERINO, Justice, dissenting.

I must dissent. The fact that appellant's wife was beaten and bruised by *someone* on certain occasions is ir-

relevant unless there is testimony to establish that it was appellant who beat her. I cannot agree with the trial judge, or the majority, who state that,

"[c]onsidering the frequency and unusual hours of the visits, the upset state of the victim and the victim's arrival for a four day visit with nothing except the clothes she was wearing, the jury was entitled to infer that the victim had acquired the black eyes and bruises as a result of problems with her husband."

It is just as possible, based on the above facts, that the victim was beaten by someone other than her husband, and was attempting to conceal that fact by not revealing to anybody who had beaten her. Her appearance at a friend's house without any clothes except those she was wearing, could also indicate that the beating took place outside of her home by someone other than her husband.

This testimony was highly prejudicial, and its relevancy was not established. The admission of this testimony was error and warrants the award of a new trial.